## O'LEARY v. UNITED STATES.

### No. 11295.

Circuit Court of Appeals, Ninth Circuit.

Feb. 27, 1947.

A. I. McCormick and Pat A. McCormick, both of Los Angeles, Cal., for appellant.

James M. Carter, U. S. Atty., and Arthur Livingston and Norman W. Neukom, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

**Before DENMAN, HEALY and ORR, Circuit Judges.**

ORR, Circuit Judge.

Appellant was convicted of voluntary manslaughter. He contends on appeal that said conviction should be set aside because the evidence, being circumstantial, fails to exclude every other reasonable hypothesis than that of guilt and that such evidence is not inconsistent with every reasonable hypothesis of innocence.

The trial court was asked to direct the trial jury to return a verdict in favor of defendant at the conclusion of the presentation of the Government's evidence. The motion was denied. No evidence was offered on behalf of defendant.

We have considered the evidence with a view of determining whether it is insufficient in the particulars urged by appellant and conclude it was not. The trial court correctly ruled that the case should go to the jury and the verdict returned by the jury is based on substantial evidence of facts which exclude every other reasonable hypothesis than that of guilt and is inconsistent with every reasonable hypothesis of innocence.[1] We have, of course,

[1] See, Kennedy v. United States, 9 Cir., 44 F.2d 131, 132; Paddock v. United States, 9 Cir., 79 F.2d 872; Thompson v. United States, 5 Cir., 145 F.2d 826, certiorari denied 324 U.S. 861, 65 S.Ct. 866, 89 L.Ed. 1418.

334

considered the evidence in the light most favorable to the Government, as is required on appeal.[2]

The pertinent facts disclosed by the evidence follow:

During the afternoon of December 9, 1945, the American merchant ship "Arthur R. Lewis" lay at anchor in Seeadler Harbor. Captain Austin Stuart Fithian was Master of the vessel. Appellant was First Mate and one Zents was Second Mate.

Captain Fithian was observed eating his evening meal between 5 and 5:30 p. m. Considerable drinking was indulged in in the cabin of the Third Mate during the hours of 6 to 7 p. m. Appellant was one of those present. During the time the parties were drinking in the Third Mate's cabin the Second Engineer left with the announced purpose of inviting Captain Fithian to join the drinking party. The Second Engineer returned in a short time reporting that the Captain was asleep.

At approximately 7:30 p. m., Noble, the Chief Engineer, took a report to the Captain's office. He assumed the Captain was asleep because the adjoining quarters were dark.

As late as 8 p. m., appellant and Cooper, the Third Mate, were drinking whiskey in appellant's cabin. Somewhere between 9 and 9:10 p. m., Watson, a seaman, saw and heard appellant and Cooper arguing on the deck above him and at a distance of approximately 40 feet from him. Appellant was very much intoxicated. Appellant gave Cooper a shove and ordered him (Cooper) to go to the other side of the deck and appellant made some remark about the use of a gun in compelling Cooper to obey that order. While observing the argument between appellant and Cooper, Watson, the seaman, saw what he took to be the figure of a man standing on the wing, or captain's, deck, two decks above Watson, one deck above appellant and Cooper. The Captain had frequently been seen at the place where the unidentified figure was seen by Watson. This position was near the Captain's office.

Within three or four minutes after appellant parted from Cooper and entered a passageway leading to appellant's cabin on the deck below the Captain's office, the sound of shots was heard coming from the direction of that office.

Kennon, the purser, and Zents were the first to reach the scene and their stories conflict to some extent.

Kennon stated that within a few seconds of hearing the shots he saw appellant some feet down a passageway from the open door of the Captain's office. Appellant was staggering along the passageway and said, "What happened?" Kennon, appellant, and possibly Zents, then walked back to the open door of the Captain's office where appellant temporarily blocked their view of the interior. Appellant then turned away and Kennon saw Captain Fithian slumped over on a settee facing his desk. In this position, a person at the open door obliquely faced the right side of the Captain's body. Appellant looked into the room and staggered away. Kennon did not hear appellant make any remark at the time, although Kennon then, by his own testimony, was greatly excited. Kennon attempted to take the Captain's pulse, and he noticed a gun standing on its sights with the trigger guard in the air, leaning against the Captain's foot. Three guns were assigned to the ship, and they were kept in a file cabinet in the Captain's office. After the shooting Kennon stated he "saw the other two guns * * * in a drawer."

Zents' testimony was that he reached the scene within 20 to 30 seconds after hearing the first volley of shots. He saw appellant standing in the open doorway leading into the Captain's office. Appellant was "facing in the door—inside towards the Captain's office". He heard appellant, while standing in that position, say: "This will hold you for a while". After appellant walked down the passageway past Zents, Zents went to the Captain's office and found the body of the Captain in the position described by Kennon. The gun at his feet was similar to a Smith & Wesson revolver that Zents, some days previously, had seen

[2] Borgia v. United States, 9 Cir., 78 F. 2d 550, 555, certiorari denied 296 U.S. 615, 56 S.Ct. 135, 80 L.Ed. 436; Canella v. United States. 9 Cir.. 157 F.2d 470, 472.

appellant use in shooting at birds from the deck of the ship. Other witnesses testified they had, on previous occasions, seen appellant with a gun.

Zents also testified that after the shooting of the Captain, he saw a piece of paper on the floor of the Captain's stateroom with "what appeared to be a bloody footprint thereon". He "thought" a naval officer had taken this piece of paper.

When Kennon and Zents reached the Captain he was dead. Blood was visible, and later six bullets were recovered from various parts of the Captain's quarters and the adjoining chart room.

A naval doctor from Manus Island, who performed an autopsy on the body of Captain Fithian the next day, found 12 bullet holes (wounds of entrance and exit) in the right side of the Captain's body and in the chest.

Two seamen who were placed on guard over appellant after the shooting saw a stain a few inches long and perhaps two inches wide on one of appellant's arms. One of the seamen thought it was blood. The other said it might have been cocoa or rust. He also said that after the shooting appellant asked where Captain Fithian was, and on being told the Captain had gone ashore appellant replied he knew well the Captain had not.

No ill will was shown to have existed between the deceased and appellant.

Appellant attacks the sufficiency of the evidence on several grounds, viz:

■ 1. The absence of evidence showing appellant's participation in the shooting.

The circumstances heretofore detailed constitute substantial evidence that he did.

■ 2. The failure of the Government to prove finger prints on the gun.

No showing was made that finger prints were found on the gun and certainly no showing was made that evidence material to appellant's defense was suppressed. In the absence of such a showing no error appears.[3]

■ 3. Absence of explanation of the paper with the bloody foot print seen by Zents.

No evidence appears that the Government had knowledge that evidence of the foot print on a piece of paper was material to appellant's defense. No effort appears to have been made to develop such a fact. The opportunity existed for appellant to examine Government officials as to the existence of any such facts. Appellant contents himself with attempting to draw unwarranted conclusions from the failure to introduce the piece of paper. We are not warranted in drawing the conclusion that the Government deliberately withheld introduction of the paper because it contained a foot print made by one other than appellant.

■ 4. Lack of motive, ill will or provocation.

Proof of motive is not an indispensible element of the prosecution's case. As pointed out by the Supreme Court in the case of Pointer v. United States, 151 U.S. 396, 414, 14 S.Ct. 410, 417, 38 L.Ed. 208:

"The charge being murder, if the facts constituting that offense were established beyond a reasonable doubt, it was the duty of the jury to have found the defendant guilty as charged, although it may have been impossible to discover any adequate motive for the killing. * * *

"The absence of evidence suggesting a motive for the commission of the crime charged is a circumstance in favor of the accused, to be given such weight as the jury deems proper; but proof of motive is never indispensable to conviction."

■ 5. No evidence of flight or resistance to arrest.

This was a circumstance which the jury had a right to and evidently did consider. It apparently did not carry sufficient weight, in the jury's estimation, to balance the scales in favor of appellant's innocence.

Appellant admitting that opportunity to commit the crime is a relevant circumstance to be taken into consideration argues

[3] Morton v. United States, 79 U.S.App. D.C. 329, 147 F.2d 28, 31; certiorari denied 324 U.S. 875, 65 S.Ct. 1015, 89 L. Ed. 1428.

that this fact of itself is insufficient to establish guilt. This is undoubtedly true but that fact does not stand alone in this case.

As to appellant's intoxication, it is apparent that the jury gave this condition due consideration as is evidenced by the verdict of manslaughter.

 We have examined appellant's contentions and find no reason to disturb the judgment of the trial court. The function of the appellate court is ended once it is determined that there "was some evidence, competent and substantial, before the jury, fairly tending to sustain the verdict."[4]

Judgment affirmed.

---

[4] Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 63 L.Ed. 1173; Hemphill v. United States, 9 Cir., 120 F. 2d 115; certiorari denied 314 U.S. 627, 62 S.Ct. 111, 86 L.Ed. 503; Yoffe v. United States, 1 Cir., 153 F.2d 570, 573.