**UNITED STATES of America,
Plaintiff,**

v.

**Charles Joseph O'BRIEN and Thomas
Parisi, Defendants.**

**Cr. No. 40081.**

United States District Court
E. D. Michigan, S. D.

May 26, 1965.

Lawrence Gubow, U. S. Atty., Paul J. Komives, Asst. U. S. Atty., Robert J. Grace, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

James E. Haggerty, William E. Bufalino, Philip A. Gillis, Detroit, Mich., for defendant O'Brien.

George S. Fitzgerald, Paul B. Mayrand, Detroit, Mich., for defendant Parisi.

FREEMAN, District Judge.

In this criminal prosecution, a 3-count indictment in the language of the statute, 18 U.S.C. § 549, charges that the defendants Charles O'Brien and Thomas Parisi unlawfully removed certain merchandise from custody and control of the United States Customs Service at the Detroit Harbor Terminal in Detroit, Michigan. At trial, defendant Parisi was found guilty on two counts and the jury found O'Brien guilty on all three counts of the indictment. Both defendants now move for arrest of judgment under Rule 34 of the Federal Rules of Criminal Procedure on the ground that the indictment does not charge an offense.

Defendants contend that the indictment is fatally defective because it fails to inform defendants in what manner the alleged removal was unlawful. Defendants argue that removing merchandise from Customs' custody is not inherently an unlawful act, but only *malum*

*prohibitum* and, hence, the indictment is fatally defective since it makes no reference to any statute or regulation which would render the alleged removal in the instant case unlawful, and so does not inform defendants of the nature of the offense charged. Defendants further contend that the word "unlawfully", as used in the indictment, is merely a conclusion of law, which is insufficient to allege the necessary element of criminal intent.

Rule 34 provides: "The court shall arrest judgment if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged."

Defendants first raised objection to the indictment during proceedings to impanel the jury on the second day of trial

■ Rule 12(b) (2), in pertinent part, provides:

"Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. * * * Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. Lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding."

Thus, by waiting until after commencement of trial to raise their objection to the indictment, defendants waived any objection other than that the indictment failed to charge an offense. United States v. Williams, 202 F.2d 712 (CA 5, 1953). In other words, it is not sufficient at this time for the indictment to be defective. If defendants' motion in arrest of judgment is to be granted, the indictment must be fatally defective for failure to charge an offense. Both rule 12(b) (2) and rule 34 so require. Even if this court concluded that the indict-

ment is defective, but not fatally defective, the motion for arrest of judgment would have to be denied as not being timely filed.

In support of their contention that the indictment does not charge an offense, defendants rely on the cases of Keck v. United States, 172 U.S. 434, 19 S.Ct. 254, 43 L.Ed. 505 (1899), and Hughes v. United States, 338 F.2d 651 (CA 1, 1964). The *Keck* case held an indictment fatally defective for failure to charge an offense under 18 U.S.C. § 545, which makes it a crime to import merchandise into the United States "contrary to law". The indictment was ruled defective because the words "contrary to law" in the statute were thought to relate to other legal provisions not included in section 545 itself. The indictment did not refer to any other statutory provisions which would make the importation of merchandise contrary to law in the particular case, and so the court held that the defendants were not sufficiently informed of the nature of the offense.

In *Hughes*, which opinion was published only after the jury verdict in the instant case, the First Circuit Court of Appeals remanded the case to the District Court with instructions to dismiss the indictment, which charged defendants with unlawfully removing certain merchandise while said merchandise was in Customs' custody and control, in violation of 18 U.S.C. § 549. The Court of Appeals held the indictment, which was substantially in the words of the statute, to be fatally defective for failure to allege felonious intent. The court rested its holding on the two conclusions that section 549 is essentially a codification of common law larceny, which has as one of its elements a felonious intent, and also that the use of the word "unlawfully" in the indictment was insufficient to allege felonious intent. In this connection, the court reasoned, "It would seem to us that 'unlawfully' is a conclusion of law meaning 'contrary to law' and no more. We do not interpret it as meaning 'knowingly.' * * * Of the cases cited by the Government as being

to the contrary, we have not found one which clearly holds that 'unlawfully' *alone* will suffice to imply an element of intent."

 It is important to note that the holding of the *Hughes* case, now cited by defendants, is not entirely consistent with the position defendants took at trial in citing and relying on the *Keck* case. *Hughes* holds that an indictment under section 549 must allege a felonious intent or be dismissed. Defendants at trial argued that an indictment under section 549 must allege the provisions of some other statute or be dismissed, citing *Keck* in support of this contention. It is clear that defendants, in relying on *Hughes,* have shifted the nature of their attack on the indictment. However, since a fatally defective indictment may be attacked at any time, defendants are not barred from raising new grounds of attack for the first time on a motion for arrest of judgment subsequent to trial.

 This court is of the view that the *Keck* case is distinguishable, because the term "unlawfully" in section 549 does not bear the same construction as the phrase "contrary to law" as used in section 545. In order for an offense to be charged under section 549, it is not necessary that the indictment refer to any statute other than section 549 itself, since the proper construction of the term "unlawfully", as used in section 549, is "with wrongful intent" rather than "contrary to the express provisions of some other statute." Under this construction, the offense of unlawful removal of merchandise from Customs' custody is analogous to common law larceny.

 The other provisions of section 549 lend support to a broad construction of the term "unlawfully". The first two paragraphs of section 549 use the phrase "without authority" in defining offenses. It seems clear that Congress must have intended that the term "unlawfully" should have a broader meaning than "without authority". Otherwise, Congress would once again have used the phrase "without authority" in defining the offense charged in this case. It should also be noted that the other offense also defined in paragraph three of section 549 speaks of maliciously entering a bonded warehouse with intent unlawfully to remove merchandise therefrom. This offense is clearly analogous to common law burglary. It is, therefore, reasonable to assign a broad meaning to the term "unlawfully" so that the second offense defined in the same paragraph should be analogous to common law larceny. Thus, statutory construction of section 549 leads to the conclusion that Congress intended the term "unlawfully" to have a broad meaning.

Defendants themselves appear to admit the propriety of this construction of the term "unlawfully" in their requested instructions to charge the jury, as follows: "Unlawfully means contrary to law. Hence to do an act 'unlawfully' means to do wilfully something which is contrary to law. An act is done 'wilfully' if done voluntarily and purposely and with the specific intent to do that which the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." Under this requested instruction to charge the jury, the term "unlawfully" clearly has a broader meaning than being contrary to the express provisions of some other statute. The requested instruction is in accord with the Government's theory that section 549 in itself defines a crime analogous to common law larceny, and that, therefore, the indictment need not have reference to any other statute to inform defendants of the nature of the offense charged.

Thus, the conclusion of the First Circuit Court of Appeals in *Hughes* that section 549 is essentially a codification of common law larceny is well taken. However, the further conclusion of the Court of Appeals in *Hughes* that the word "unlawfully" does not allege a felonious intent is contrary to the instructions to the jury requested by defendants in the instant case. Further, such a construction of the word "unlawfully" ren-

ders the word mere surplusage in section 549. The Court of Appeals in *Hughes* argued: "Indeed, it would seem to us that the indictment as it is phrased would support the conviction of a person who innocently removed goods from customs custody and control before their release, mistakenly thinking the appropriate papers complete when they were not." But if "unlawfully" does not mean "with felonious intent", then section 549 itself defines the innocent removal of merchandise from customs custody as a crime regardless of a mistake. Under the construction urged by the court in *Hughes,* it is not merely the indictment as it is phrased that supports the conviction of an innocent remover of merchandise; it is the statute itself. Surely Congress cannot have intended to make the removal of merchandise from customs' custody a felony in the absence of a felonious intent, as the First Circuit, in effect, held in *Hughes.* However, the requirement of felonious intent can be found in the statute only in the word "unlawfully". If felonious intent is an element of the offense as defined in section 549, it is because the word "unlawfully" makes felonious intent an element. Otherwise, the offense defined is merely *malum prohibitum.*

In other words, the two conclusions of the Court of Appeals in the *Hughes* case are entirely inconsistent with each other. If section 549 is a codification of common law larceny, including the element of felonious intent, then it cannot be said that "unlawfully" does not mean "with felonious intent", for nowhere else in the statute can language be found which makes felonious intent an element of the offense.

Despite the lack of authority cited to the Court in *Hughes,* there are many cases which hold that the word "unlawfully" alone suffices to imply an element of intent. For example, it has been held that an indictment which uses the word "unlawfully" will be sufficient against a suggestion that the word "wilfully" should have been used, if the element of wilfulness is a part of the crime. How-

enstine v. United States, 263 F. 1, 4 (CCA 9, 1920). Further, in Swepston v. United States, 227 F.Supp. 429, at 432 (D.C.W.D.Mo., 1964), the court stated: "Ordinarily an allegation that an act is unlawfully, wilfully, knowingly or feloniously done imparts not only knowledge of the thing done but also an evil intent or bad purpose or motive and an awareness of wrongdoing." Also, in United States v. Deutch, 98 U.S.App. D.C. 356, 235 F.2d 853 (1956), an indictment charged the defendant with unlawfully refusing to answer questions. Although the District Court had dismissed the indictment for failure to include the adverb "wilfully", the Court of Appeals of the District of Columbia ruled that the indictment did not need to allege that the refusal was wilful, stating: "Any doubt on this is resolved by the presence of the word 'unlawfully' preceding 'refused' in this indictment; that would satisfy the statute since a refusal would be unlawful only if it were willful. In other words, if 'refused' standing alone were held not sufficient because it does not connote a refusal which violates the statute, the presence of the word 'unlawfully' would remedy that defect."

It is well established that an indictment drawn in the language of the statute is a sufficient pleading. In United States v. Sacher, 139 F.Supp. 853 (D.C.Dist. of Col., 1956) (opinion by Judge Holtzoff), a case in point, the court stated:

"This is a motion by the defendant to dismiss an indictment charging him with contempt of Congress in that he unlawfully refused to answer certain pertinent questions propounded by a Congressional Committee, as set forth in the indictment. It is urged that failure to allege that the refusal was willful, deliberate or intentional is a vital defect in the indictment.

\* \* \* \* \*

"When we come to deal with sufficiency of indictments, cases dealing with technical forms of indictments decided prior to the advent of the present Federal Rules of Criminal Pro-

cedure, 18 U.S.C.A., do not constitute any authority. One of the purposes of the rules was to jettison the old rulings under which a person might go unwhipped of justice, though he had committed a serious offense, merely because the draftsman of the indictment omitted some word or phrase which did not actually affect the meaning of the accusation

\* \* \* \* \* \*

"The contents of an indictment are governed now by Rule 7(c) of the Federal Rules of Criminal Procedure, which provides merely that 'The indictment \* \* \* shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.'

"It has been explained by the authorities construing this rule that the indictment must meet two tests. First, it must set forth the essential facts, with sufficient definiteness in order that the defendant may be apprised of the exact offense with which he is charged and the precise accusation that he will have to meet at the trial. Second, it must be sufficiently definite in order that the defendant may be able to avail himself of the plea of former jeopardy in the event that an attempt should be made at a subsequent time to prosecute him for the same offense.

"Obviously this indictment meets these two tests, and also complies with the requirements of Rule 7(c)."

The court held that the indictment using the word "unlawfully" instead of the word "willfully" was not defective.

In United States v. Silver, 235 F.2d 375 (CA 2, 1956), the Court of Appeals ruled that while a violation of the false statement statute, 18 U.S.C. § 1001, required proof that the statement related to a material fact, an indictment was sufficient even though it failed to allege materiality where it followed statutory language. Judge Frank stated in a concurring opinion:

"If the statute, correctly interpreted, makes materiality an essential part of the crime, then the statute, although not expressly referring thereto, nevertheless, by implication, imports the element of materiality. Accordingly, the indictment, using the very words of the statute, necessarily by implication imports an allegation that the false statements were material. To put it differently, if the statute, without mentioning materiality, implies that element, then so does the indictment; the shorthand expression sufficient in the one is equally sufficient in the other."

■ This court remains of the opinion that the indictment in this case states an offense, and is not fatally defective for failure to inform the defendants of the nature of the offense. The motion for arrest of judgment is therefore denied for the reasons above stated and also as set forth at pages 1108 to 1112 of the trial transcript.

On Motion for New Trial

(Dictated in Open Court).

I now turn to the motions of both defendants O'Brien and Parisi for a new trial. These motions are made under Rule 33 of the Federal Rules of Criminal Procedure, which in pertinent part provides: "The court on motion of a defendant may grant a new trial to him if required in the interest of justice."

The defendant O'Brien submitted a brief in support of his motion. I want to commend counsel on the very thorough preparation of the brief and the presentation of arguments in support of the motion. It appears that every possible ground and reason that could have been made in support of the motion were set forth, and the principal reasons were argued with considerable skill and competency.

First of all I will take up the motion of O'Brien for a new trial and discuss each of the reasons and grounds relied upon as stated in the motion. But before doing that, I desire to point out that on oral argument in support of O'Brien's motion, counsel, so far as I could deter-

mine from the oral argument relied only upon five grounds, namely:

1. That the Government argued to the jury concerning the failure of O'Brien to take the stand as a witness, in violation of his constitutional privilege not to do so.

2. The Court invaded the province of the jury by charging that Area B of the Detroit Harbor Terminal was a bonded warehouse, as a matter of law.

3. The Government did not comply with its duty to call the witness Brown, who was allegedly an eyewitness to the removal of the merchandise.

4. Failure of the Court to give the defendant O'Brien's request to charge No. 12, dealing with a lack of flight and voluntary appearance of O'Brien at the warehouse, which facts the defendant requested that the Court instruct the jury were evidence of innocence.

5. The failure of the juror Tickner to disclose his prior relationship as an employee of a company owned and operated by Mr. Young, who at the time of trial was the head of the Detroit Harbor Terminal.

Now, in all fairness to the defendant O'Brien, I do note that in his brief, in his memorandum in support of the motion for a new trial, he does state as follows:

"It is not the intention of the Defendant to brief all of the points raised in the motion for new trial. Many of them have been adequately argued at trial and citations of authority given the court. The failure of the Defendant O'Brien to brief any point should not be considered as a waiver of that point."

Nevertheless, I assume from the fact that counsel did argue five of the grounds set forth in the motion for a new trial orally to this Court and at some length, he relied primarily on those grounds. But I also want to state that I have also considered all of the reasons and grounds in reaching a conclusion and in disposing of this motion, and, as I have already said, I will discuss each of these grounds in the order set forth in the motion. I will do this as briefly as I can.

■ 1. The charge that the jury verdict was contrary to law is not specific enough in itself to support the motion for a new trial.

2. The charge that the verdict was against the great weight of the evidence has been considered and disposed of in connection with the motion for judgment of acquittal.

3. Defendants contend they were prejudiced by the prosecutor's closing argument, when on December 21—this appears at page 1168 of the transcript—he, that is, Mr. Komives, who tried the case for the Government, commented on the opportunity of the defendants to present witnesses on their behalf, and after objection by the defendants to this type of argument, the Government's attorney on the following day—which appears at page 1343 of the transcript—stated, and I am only quoting in part the pertinent relevant part of his statement to the jury:

"* * * and yet Mr. Young testifies, 'No, O'Brien never has talked to me since about this subject' and there is no contradiction of that at all in this record."

Defendants argued this point and the Court ruled on it at pages 1356 to 1363 of the transcript. Defendants argued that since O'Brien was the only person who could contradict Young's testimony, the statement by Mr. Komives constituted improper comment upon the failure of O'Brien to take the stand.

Defendant O'Brien cited four cases in support of this argument: Linden v. United States, 3 Cir., 296 F. 104; Leathers v. United States, 9 Cir., 250 F.2d 159; Langford v. United States, 9 Cir., 178 F.2d 48; and Garcia v. United States, 5 Cir., 315 F.2d 133. These cases all support the proposition that where a defendant is the only person who could contradict Government testimony, a remark by the prosecutor that the testimony is uncontradicted amounts to an improper

comment on the defendant's failure to take the stand.

However, it would seem that in the instant case Mr. Komives' comment that Young's testimony was uncontradicted would constitute an improper comment on O'Brien's failure to take the stand only if the jury would be likely to conclude from the statement in the context of the argument that O'Brien's failure to contradict the testimony reflected adversely on O'Brien in some manner.

McCormick, in his treatise on evidence at Section 132, states: ". . . manifestly the prosecution may likewise argue that the state's evidence or some part of it is uncontradicted or undisputed. Whether this latter stock argument may be employed when the proof shows that the accused is the only person who could have contradicted it is in conflict. Probably the better view is that such an argument is not a violation of the statute unless in the particular case the argument seems to have been specifically planned by counsel and probably understood by the jury as a comment on the silence of the accused."

It is clear from an examination of the context of Mr. Komives' allegedly prejudicial comment that he was not attempting to suggest to the jury any improper inference concerning O'Brien's failure to take the stand. He continued his argument by stating there were only two inferences to be drawn from the uncontradicted statement of Young that O'Brien had never talked to him since—either that Young was telling the truth or that he was lying. Mr. Komives' argument to the jury was in substance that in either event it was damning to O'Brien. If Young were telling the truth, argued Mr. Komives, then O'Brien would know better than to talk to him later and try to fabricate an alibi. But if Young were lying, O'Brien must have talked to him in an attempt to establish an alibi, and therefore Young was covering up for O'Brien.

Thus, Mr. Komives, it appears to this Court, was clearly not arguing that Young must have been telling the truth because O'Brien did not take the stand to contradict him. On the contrary, the argument called Mr. Young's credibility into question, in spite of the fact that his statement was uncontradicted. The remark that Young's statement was uncontradicted was part of an argument based on opposing interpretations of Mr. Young's credibility, and when the remark is seen in this context, it is highly unlikely that the jury drew from the remark any unfavorable inference concerning O'Brien's failure to take the stand. Indeed, the jury hardly had time even to reflect that O'Brien was the only person who could have contradicted Young's statement. Further, this Court does not consider that the statement of Mr. Komives was specifically planned as a comment on the silence of the defendant O'Brien.

In 23A C.J.S. Criminal Law § 1098, at page 172 the text reads: "It is not improper for the prosecuting attorney to remark that testimony for the prosecution is unexplained or uncontradicted, especially where the jury are instructed to disregard such comment as bearing on accused's failure to testify; and this has been held to be true, even though accused is the only person who was in a position to dispute such testimony."

In the case of People v. Earl, 299 Mich. 579, 300 N.W. 890, the prosecutor brought in testimony as to the contents of a conversation between the defendant and the witness. The defendant was the only person who could have contradicted the testimony of the witness. Defendant rested at the close of the proofs by the prosecution. The prosecutor argued, "What has been testified to has not been disputed. It has not been denied." The court ruled that the prosecutor had a right in urging weight to be given the testimony to argue that the testimony was uncontradicted and undisputed. The court also stated: "It was the right of defendant to let his case rest upon the testimony introduced by the prosecution, but this did not curtail argument on the proofs before the jury, and it is too far-

fetched for him to characterize what was said as prejudicial comment on the failure of defendant to testify."

Wigmore, in discussing this question of comment on the failure of the accused to testify, at Section 2272 of his work states:

> "But there is no call for the stringent rule that a new trial shall be granted ipso facto where comment has been improperly made. The trial judge must be trusted not only to control counsel but also to remedy the effect of his impropriety."

 In the opinion of this Court, the remark of Mr. Komives that Young's statement was uncontradicted was not specifically planned to prejudice O'Brien, nor did it cause the jury to look unfavorably upon O'Brien's failure to take the stand. Therefore, O'Brien, in the opinion of this Court, was not prejudiced by the remark and the remark was not improper.

But even assuming hypothetically that the remark was prejudicial, defense counsel argued and the Court specifically instructed the jury that O'Brien had a constitutional right not to take the stand, and that no inference should be drawn from his failure to do so. In the opinion of this Court, such instructions corrected any possible error. Therefore, a new trial is not "required in the interest of justice" on this ground under Rule 33.

4. The charge that defendants were prejudiced when the juror Francis Tickner concealed from the Court the fact that he at one time worked for Mr. Young in a corporation located at what is now the premises of Detroit Harbor Terminal affords no basis for a new trial. It is not alleged by defendants that Mr. Tickner ever worked for the Detroit Harbor Terminal or was connected with it in any way. The allegation that he once worked for a corporation located on the same premises at that time is of no consequence. The question asked Mr. Tickner was whether he was connected with the Detroit Harbor Terminal itself, and there was no reason for him to reveal any former employment by Mr. Young in connection with this question. I might also add in connection with this ground of the motion the argument made by the Government, as follows:

> "Even were the matter here asserted grounds for disqualification, if true, the cases hold that the objection comes too late when made in a motion for new trial. Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187. This is most assuredly the case where, as here, counsel were made aware of the matter which is now put forward halfway through the trial (Mr. Young being a witness on December 12). At that time there were two alternate jurors still available. Counsel have slept on their claim, if any exists, and it has been waived. Spivey v. United States, 5 Cir., 109 F.2d 181, certiorari denied."

It is true that in this case there were two alternate jurors when this arose.

5. The charge that the Court erred in charging the jury that Area B is a bonded warehouse as a matter of law is a challenge to the Court's ruling at pages 1208 to 1212 of the transcript.

Briefly stated, defendants have objected to the Court's instruction that the legal effect of the evidence was to constitute Area B as a bonded area as a matter of law on three grounds.

First, defendants claim that the application for the bonded warehouse was improper, in that the application did not specify what class of warehouse was requested, as is required by 19 C.F.R. (Code of Federal Regulations) Section 19.2(a); and also in that the application stated that the warehouse was to be used for export as well as import, despite the requirement of 19 U.S.C. Section 1555 that, "Except as otherwise provided in this chapter, bonded warehouses shall be used solely for the storage of imported merchandise."

Secondly, defendants claim that the use of the bonded warehouse was improper, in that it was in fact used for the

storage of export as well as import goods, contrary to 19 U.S.C. Section 1555.

Thirdly, defendants claim that since Area B was not marked by signs as a bonded warehouse or enclosed by a fence so that a stranger would know that Area B was a bonded warehouse, Area B cannot properly constitute a bonded warehouse. Defendants argue that under 19 U.S.C. Section 1555, which reads in part, "Buildings or parts of buildings and other enclosures may be designated by the Secretary of the Treasury as bonded warehouses * * *," a bonded warehouse is required to be an enclosure, and since Area B was not enclosed, it cannot be a bonded warehouse.

 It is true that the application for the bonded warehouse did not specifically state what class of warehouse was requested. However, it could be fairly construed from the letter of application and accompanying map that the application was for a Class 4 bonded warehouse. 19 C.F.R. Section 19.1 includes in the classification of Class 4 bonded warehouses, "Bonded yards or sheds for the storage of heavy and bulky imported merchandise." It was clear from the map connected with the application that Area B consisted of a yard and a shed, and therefore a Class 4 warehouse was the only type of bonded warehouse for which the application could have been legitimately construed to be made; and the application was approved so as to constitute Area B as a Class 4 bonded warehouse in accordance with the regulations. The fact that the application stated that the warehouse was to be used for export as well as import does not destroy the character of Area B as a bonded warehouse. It should be noted first that nowhere in the definition of a Class 4 bonded warehouse as found in 19 C.F.R. Section 19.1(a) (4) is there any requirement that a Class 4 bonded warehouse be used exclusively for the storage of imported merchandise. On the other hand, a Class 3 bonded warehouse, as defined in 19 C.F.R. Section 19.1(a) (3), does have this restriction on its use.

Defendants rely on 19 U.S.C. Section 1555, which states that except as otherwise provided, bonded warehouses shall be used solely for the storage of imported merchandise. However, the Government points out that 19 U.S.C. Section 1311 (eighth paragraph) authorizes the use of "any bonded warehouse" for storage of export merchandise under certain conditions. It is apparent from the use in Section 1311 of such other terms as "bonded warehouse, class six" or "any bonded manufacturing warehouse" that the term "any bonded warehouse" is not restrictive and would include a class four bonded warehouse. Since Section 1311 authorizes storage of merchandise for export in "any bonded warehouse" under certain circumstances, an application for a class four bonded warehouse is not deficient merely because it states that the area may be used for storage of export as well as import merchandise. By the same token, the actual use of Area B for the storage of export merchandise, being authorized by Section 1311, would not destroy the character of Area B as a bonded warehouse.

Defendants' final argument on this point that Area B was not a bonded warehouse because it was not enclosed by a fence overlooks the language of 19 C.F.R. Section 19.1(a) (4) defining a class four bonded warehouse. That section reads in pertinent part as follows: "If the collector deems it necessary, the yards shall be enclosed by substantial fences with entrance and exit gates capable of being secured by customs locks."

 In this case there is no showing that the collector deemed it necessary to enclose Area B by fences and gates secured by locks. Section 19.1(a) (4) clearly admits the possibility of a properly bonded class four warehouse not entirely fenced in, at the discretion of the collector.

Defendant now presents the additional contention that when the Court charged the jury that Area B was a bonded warehouse as a matter of law, he took away from the jury the right to consider whether the Government had proved one

of the essential elements, and therefore invaded the province of the jury. However, in view of the fact that the Court's instruction was based on the construction of a number of statutes and regulations, which I have already referred to and which it clearly appears to this Court the jury could not possibly be expected to keep in mind and construe and apply to the facts in this case, there was no undue invasion of the province of the jury by an instruction as to the status of Area B as a matter of law.

The cases cited by the defendant in this connection relate to other statutes and are distinguishable in that the jury would not have been obliged, in considering those cases, to construe a large number of statutes and regulations, as in the instant case.

■■■■ It is well settled that the Court can comment on the legal effect of the evidence (88 C.J.S. Trial § 296), and that where the evidence in support of facts is of a controlling character and is not controverted by other evidence so as to require that such facts should be determined by the jury, the court in instructing the jury may assume that such facts are true (88 C.J.S. Trial § 282).

In the instant case, the Court's instruction was that the legal effect of the evidence would be to constitute Area B is a bonded warehouse as a matter of law. The instruction was based on the contents of the application for the bond covering Area B and also the accompanying map, which are assumed to be accurate The Court's ruling was based on this since their authenticity was not questioned. The Court's ruling was based on this documentary evidence and the applicable statutes and regulations as interpreted in the light of this evidence. The ruling therefore constitutes proper comment on the legal effect of the evidence and does not unduly invade the province of the jury.

At 89 C.J.S. Trial § 438, the text reads: "A charge which, taken as a whole, correctly submits the issues to the jury will not be held objectionable because certain instructions, taken in their severalty, may be subject to criticism on the ground that they invade the province of the jury."

There is no reason for the Court to find error in its instruction that the legal effect of the evidence would be to constitute Area B was a bonded warehouse as a matter of law, nor is there any reason to take further testimony on the question, as defendants suggest.

■■■■ 6. The charge that the Court erred in giving the Government's requested instruction concerning the inferences to be drawn from recent possession of unlawfully removed merchandise does not support a new trial. There is no question that a similar instruction is proper in a case of common law larceny, for instance. Since this Court has given a construction to the phrase "unlawfully removes" in 18 U.S.C. Section 549, in disposing of the motion for arrest of judgment, which makes the offense charged analogous to common law larceny, the requested instruction is equally proper in this case.

■■■■ 7. The charge that the Court erred in instructing the jury they could find Parisi not guilty and O'Brien guilty is without merit. It is not the law that a person cannot be guilty under 18 U.S.C. Section 2(b) unless another person is convicted of the substantive offense. Otherwise, any person who procured a criminal act to be done by an innocent dupe would be, in effect, immune from prosecution.

18 U.S.C. Section 2(b) does not countenance any such result. The section reads as follows: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." The statute does not require that the person actually doing the act must first be convicted.

8. Defendants here contend that the Court erred in failing to instruct the jury that they must find three separate takings before they could convict the defendants on each of the counts. This

ground was originally raised, as I remember it, by the defendant Parisi in support of his motion for judgment of acquittal. In any event, it is now stated as one of the grounds of the defendant O'Brien and as also adopted by the defendant Parisi in support of their motions for a new trial.

 In further considering this contention, it appears that the only evidence in the record of more than one taking was a statement by Finazzo at page 411 of the transcript that Parisi had removed the scrap on March 18 and 19. This statement, not made in Parisi's presence, was not binding on Parisi. Neither was it binding on O'Brien, under the circumstances then prevailing, who was present at the time the statement was made but who was not necessarily in a position or under any duty to deny the statement. Thus, there is no evidence in the record binding on either defendant— that is, O'Brien or Parisi—that the merchandise in question was taken on more than one occasion. Therefore, the Court is required to assume that all of the items taken were removed from the Detroit Harbor Terminal on but a single occasion.

Defendants contend that the taking of the three different types of merchandise set forth in the three counts of this indictment did not constitute three separate offenses justifying an indictment containing three counts. The question presented, therefore, is whether the taking of the three types of items constituted a single or separate offenses, and if a single offense, whether the Court can remedy the charge by imposing only a single penalty.

The Government urged in support of the indictment containing three counts that the grand jury relied upon the manifest of the freight on the Steamship Montrose as a basis for alleging removal of certain types and classes of merchandise in different counts. Be that as it may, as was recognized in the case of Hughes v. United States, 338 F.2d 651, relied upon by the defendants in support of their motions for arrest of judg-

ment—a First Circuit case decided in 1964, and the opinion of which was published after the verdict in this case, the offense of unlawful removal from customs custody under 18 U.S.C. Section 549 is a crime analogous to common law larceny. It is therefore appropriate to look to the common law of larceny to determine whether the defendants were properly charged with three statutory offenses.

According to 52 C.J.S. Larceny, §§ 53 and 54:

"Where several articles are stolen from the same owner at the same time and place, only a single crime is committed, and the taking of separate articles belonging to the same owner from different places in the same building, pursuant to a single criminal impulse, usually is held to constitute only a single larceny. * * * The prevailing rule is that where several articles, stored in the same place, are taken by a single larcenous act, the mere fact that some of them belong to one person and some to another does not dissolve the act into separate crimes."

 Thus, regardless whether the articles removed from the Detroit Harbor Terminal belonged to one or more owners, the unlawful removal of the articles at one time constituted only a single offense which should have been charged in a single count of the indictment.

In United States v. Klein, 247 F.2d 908, 919, (C.A.2) the court said: "The prosecution may allege the same charge in different counts with the protection that only a single penalty is permitted. When there are double penalties we reverse one, not both; and, as is well settled, a jury acquittal on one count does not require reversal of conviction on another count, even though there may seem a surface inconsistency." To the same effect is the case of United States v. Spector, D.C., 99 F.Supp. 778. At page 783 of the opinion the court says: "It is permissible to charge a single offense in

different ways and separate counts, but upon conviction punishment may be imposed only for a single offense."

Further, in Seymour v. United States, 77 F.2d 577, 99 A.L.R. 880 (C.A.8), it was stated that a trial court has a sound discretion as to requiring joinder in one count of matters which are alleged separately in several counts. The court held that there was no error in the failure of the prosecution to put all questions and answers charged as perjury into one count, since there was only a single sentence which might have been imposed upon any one of the five counts upon which there was conviction. The court stated, "[A]ll possible harmful effect upon appellant was nullified by the sentence imposed."

In the case of Kerr v. Squier, 151 F.2d 308, (C.A.9), involving a habeas corpus proceeding, the court held that three separate counts charging the theft of three mail bags from the post office justified only one sentence, and therefore required the discharge on habeas corpus of the defendant, who had already served one five-year sentence on one of the three counts, because the court had concluded that the bags were taken simultaneously in one transaction. Also see Johnston v. Lagomarsino (C.A. 9), 88 F.2d 86: and Braden v. United States (C.A.8), 270 F. 441.

The foregoing cases support this Court's conclusion that the taking of the three different types of merchandise presumably at the same time constituted only a single offense and therefore justifies only a single penalty.

 It does not follow, however, that the failure to instruct the jury that they must find three separate takings before they could convict the defendants on each of the counts was error justifying a new trial. The above-cited cases establish that a single offense may be charged in more than one count, provided only a single sentence is imposed.

Since this Court considers that both defendants have been convicted of what amounts to only one offense, in the absence of any binding evidence of more than one taking, only a single sentence will be imposed on each defendant. However, a new trial, on this ground at least, would serve no purpose.

9 and 10. The charges that the Court erred in admitting into evidence certain exhibits—that is, Exhibits 18, 19, 24 and 28—to which objections were made, are not grounds for a new trial. As the Government contends in its brief, "The Court has ruled on this contention and no new considerations are put forward." Therefore, the Court reaffirms its rulings made with respect to the introduction and reception of these exhibits at pages 427 and 428 of the transcript, and also at pages 1105 to 1109 of the transcript. It may be noted here that Rule 52 of the Federal Rules of Criminal Procedure provides that: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

 11. The charge that the Court erred in failing to turn over to defendants the statements of witness Smith which related to his interviews with prospective witnesses is not grounds for a new trial, in view of the Government's answer that that portion of the agent's report relating to his testimony was turned over as each witness testified; memoranda of interview were then turned over as required by 18 U.S.C. Section 3500, the Jencks Act.

12. Defendants charge that they were prejudiced by the Government's failure to call the witness Brown, who was allegedly the only eyewitness to the actual taking of the merchandise involved in the indictment. As I recall it, the witness Brown was under subpoena by the Government when the case first went to trial, which was followed by a mistrial, but was not under subpoena, I believe, at the time the case came on for trial after the motion for mistrial was granted. But in any event, the witness Brown was under subpoena, and I think it was stated here on the record and not disputed that the witness

Brown was here and was under subpoena both by the Government and by the defendant.

General common law governs this question—that is, whether the prosecution was obliged to produce the eyewitness Brown. 23 C.J.S. Criminal Law § 1019 states: "Under the rules now usually recognized, much is left to the discretion of the prosecuting attorney under the general direction of the trial judge, and the prosecution is not required to produce or call as witnesses at the trial all persons who saw the crime committed, even though there is only one eyewitness. "The prosecuting attorney is not obliged to call any eyewitness in whom he lacks confidence, or whose veracity or integrity he doubts."

 It appears from the same citation, 23 C.J.S. § 1019, that Michigan is the only jurisdiction that retains a rule requiring the production of eyewitnesses, and, therefore, this Court is in no way required to follow the Michigan rule.

Defendant argues that the trend of recent Federal decisions has been to require, on constitutional grounds, that the Government produce and call important eyewitnesses, citing United States v. Ramsey, D.C., 220 F.Supp. 86, and United States ex rel. Drew v. Myers, 3 Cir., 327 F.2d 174. In Ramsey, the court merely held that the prosecution must product as a witness a paid informer where the defense interposed was entrapment by the informer. In Myers, the court noted at page 179 that the prosecution has no duty to call any witness, even an eyewitness, if it believes after examination or investigation that his testimony is either unreliable, surplusage or irrelevant.

The majority rule, as mentioned above, is that the prosecutor is not required to call eyewitnesses. See Young v. United States, 5 Cir., 107 F.2d 490; and Robinson v. United States, 76 U.S.App.D.C. 29, 128 F.2d 322. It should be noted also that even the Michigan law is not as clear-cut as defendant argues in its brief. Michigan Law and Practice, Vol. 8, Criminal Law, Section 325, states the law in Michigan as follows: "It has been stated broadly that the general rule is that it is the duty of the prosecuting attorney to call all known witnesses to the offense charged if possible * * * however, the rule is not unlimited and the prosecution is not required in all cases to call all the witnesses to a transaction or res gestae witnesses, especially where the offense charged is not a crime of violence."

The crimes charged in this indictment were not crimes of violence, and therefore it would seem that even Michigan common law does not necessarily compel production of the witness Brown.

Furthermore, Cyclopedia of Federal Procedure, Vol. 11, Section 47.202, states: "Either party subpoenaing witnesses has the right not to call the witnesses subpoenaed, without being subjected to any adverse inference therefrom, provided the witnesses are equally accessible to the other party."

 In this case, since the potential witness Brown was equally accessible to the defendants and was under subpoena by both parties, there was clearly no duty on the Government to call him as a witness.

13. Defendants here charge that they were prejudiced when the Government called two witnesses before the jury and offered them for cross-examination without questioning them directly. The answer of the Government to this point is sufficient: "The agents were called at the behest of defense counsel and to avoid being charged with nonproduction of a witness within the peculiar control of a party. In addition, no objection having been made at the time, it should not be entertained now."

 In a criminal trial, the Government is not under a duty to place on the witness stand every person who may have some knowledge of the crime charged. Curtis v. Rives, 75 U.S.App.D.C. 66, 123 F.2d 936. But if the Government had no duty to call the witnesses in the first place, it certainly had no duty to

examine witnesses it did call entirely at defendant's request.

14. Defendants also charge the Court erred in failing to require the Government to disclose the names of prosecution witnesses for the purpose of voir dire examination of jurors. This motion was argued at pages 4 to 17 of the transcript and the Court ruled on the request at pages 18 to 20. This ground is clearly without merit and will not be further discussed.

15. Defendants here charge that they were prejudiced when the Government wrongfully permitted the witness Smith to deceive the Court, the jury and the defendants by testifying that he had recited the entire conversation between Agent O'Rourke and the defendants, when in fact he well knew that there were additional stenographically reported conversations between O'Rourke and the defendants, the transcripts of which were in Smith's possession.

The transcript at page 461 clearly indicates that when Smith said he had recited the entire conversation, he was referring to the conversation held at 300 Watson Street at the time of the arrest. Other stenographically reported conversations occurred later on. Thus, there was no deception involved in the answer given by Smith on page 461 of the transcript.

16. Finally, defendants charge that the Court erred in failing to give certain requested instructions. The reasons of the Court in refusing to give these requests were given during the trial in support of the rulings at pages 1141 to 1146 of the transcript. However, I will take these requests up individually.

Defendant O'Brien objects to the Court's failure to give requested instructions Nos. 10, 12, 13, 15 and 16, and supplemental requested instructions Nos. 1, 2 (as amended), 3, 4, 5 and part of No. 6.

Taking these up in the order mentioned, No. 10 is unsupported by authority and clearly improper.

No. 12 states that the "lack of flight is evidence of innocence. In determining the guilt or innocence of defendant O'Brien you are entitled to consider as evidence of his innocence the fact that he voluntarily appeared at the warehouse on 300 Watson Street." This instruction was unsupported by authority at trial and refused then as argumentative. Defendant now cites the case of O'Leary v. United States in his brief, reported at 9 Cir., 160 F.2d 333, in support of this ground and in support of refusal to give this request No. 12. In that case the appellant attacked the sufficiency of the evidence to support his conviction on the ground, among others, that there was no evidence of flight or resistance to arrest.

The court stated that this was a circumstance which the jury had a right to consider. The court did not state that the lack of flight was evidence of innocence. Further, the O'Leary case does not support the contention that O'Brien's voluntary appearance was evidence of innocence. The requested instruction remains argumentative.

Requests 13 and 15 are also argumentative and properly refused.

Request 16 concerning Area B as a bonded warehouse has previously been discussed. Defendants, in effect, raised this same objection twice.

Supplemental request No. 1 is incorrect and unsupported by authorities.

Supplemental request 2 was refused because it was covered by the Government's amended instruction No. 2.

Supplemental request 3—that is, to the effect that the jury could not convict O'Brien if it acquitted Parisi—has been previously discussed.

Supplemental requests 4 and 5 were also unsupported and clearly improper.

Parts of supplemental request 6 of O'Brien were withdrawn, in the light of the Court's instruction concerning Area B as a bonded warehouse, which has already been discussed.

Defendant Parisi in his motion for a new trial relies on all of the reasons set forth in the motion of O'Brien and additionally contends that the Court err-

ed in failing to give his requests 2 and 4 and in giving O'Brien's request No. 6.

Parisi's request No. 2 defines as an element of the offense, knowledge that Area B was a bonded warehouse. This is, in effect, the same request as O'Brien's supplemental No. 5 and is improper because the statute does not make such knowledge an element of the offense.

Parisi's request No. 4, like O'Brien's request 16, is not in accord with the Court's ruling that the legal effect of the evidence with respect to Area B was that it was a bonded warehouse as a matter of law, which this Court has already discussed in connection with ground 5 of O'Brien's motion.

O'Brien's request No. 6 was proper as a statement of his theory of the case. Hence, Parisi's objection to this instruction, being one of the grounds of his motion for a new trial, is therefore not well taken.

In sum, none of the points raised by the defendants O'Brien and Parisi are grounds for a new trial "in the interest of justice" according to Rule 33 of the Federal Rules of Criminal Procedure. Hence, the motions for a new trial must be denied.