**UNITED STATES of America**

v.

**Kenneth Maurice McNAIR.**

**Crim. No. 71–698.**

United States District Court,
E. D. Pennsylvania.

April 21, 1972.

Carl J. Melone, U. S. Atty., Barry W. Kerchner, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Gordon Gelfond, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

NEWCOMER, District Judge.

Defendant was originally charged under a two count indictment alleging first, that defendant received goods unlawfully removed from customs custody knowing the same to have been unlawfully removed,[1] and second, that the

---

1. It is true that the indictment in this case charges that defendant received goods unlawfully taken from a cargo under bond and in customs custody. It is further true that the goods in question were not technically under bond in the hold of the Sugura Maru. It appears fairly clear that imported goods are under bond only after being placed under bond by the consignee or the customs department after unlading. (See 19 U.S.C. § 1551 and 19 U.S.C. § 1552, and Title 19, Index, Storage in Bond, Bonded warehouses and transportation in bond generally). However, the strict record-keeping requirements of Title 19 relating to manifests and unlading permits perform much the same function as the bonding system for domestic storage and transportation of goods subject to uncollected duties. Further, though the indictment is conjunctive, the statute under which defendant is charged is disjunctive. The Court is of the opinion that since the goods were

defendant threw the cassette tape player-radio which was the subject of this indictment into the Delaware River, or aided and encouraged that throwing, in violation of 18 U.S.C. § 2232, § 2.

Trial was held on March 8, 1972, before this Court. No evidence was introduced which would justify a conclusion, beyond a reasonable doubt, that the defendant had been the person in the unruly crowd which gathered who threw the radio, or that defendant aided or abetted that throwing, and so defendant was acquitted of Count 2 by this Court. Defendant was convicted as to Count 1 however, but in his post-trial motions, defendant has raised some serious questions regarding the propriety of some of this Court's rulings at trial on the competence and admissibility of certain evidence presented by the Government. This memorandum is being written to examine these objections more fully.

The relevant portions of 18 U.S.C. § 549 read as follows:

"Whoever, maliciously enters any bonded warehouse or any vessel or vehicle laden with or containing bonded merchandise with intent unlawfully to remove therefrom any merchandise or baggage therein, or unlawfully removes any merchandise or baggage in such vessel, vehicle, or bonded warehouse or otherwise in customs custody or control; or

Whoever receives or transports any merchandise or baggage unlawfully removed from any such vessel, vehicle, or warehouse, knowing the same to have been unlawfully removed—

Shall be fined not more than $5,000 or imprisoned not more than two years, or both.".

 Under the terms of 18 U.S.C. § 549, the evidence in this case must establish a number of things beyond a reasonable doubt:

1. That something was removed from customs custody;

2. That the removal was unlawful—this term in this statute has been interpreted to mean that the taking was done with felonious intent analogous to common law larceny, and not simply in contravention of some existing law or regulation. United States v. O'Brien, D.C.Mich., 255 F. Supp. 755 (1965), Affd. 365 F.2d 601 (6th Cir., 1966), Hughes v. United States, 338 F.2d 651 (1st Cir., 1964);

3. That defendant received the article; and

4. That defendant knew it was unlawfully taken. (Defendant need not have exact technical knowledge that it was in customs custody, merely that it was feloniously taken. See United States v. O'Brien, supra.)

The Government's theory of the case at trial was as follows:

1. That the Sugura Maru was a Japanese freighter;

2. That the Sugura Maru was tied up at Pier 80 on the day in question;

3. That part of the cargo in the hold of the Sugura Maru was Weltron Solid State 8-track stereo portable tapeplayers with FM-MPX/AM radio;

4. That newly opened empty cartons labeled Weltron Solid State 8-track Stereo Portable Tapeplayers with FM-MPX/AM Radio were found by customs agents on Pier 80;

5. That the two digit numbers written on those cartons matched certain of the seriatim two digit numbers on the ship's manifest identifying cartons of Weltron tapeplayer-radios in the ship's cargo to be offloaded in Norfolk, Virginia;

---

removed from customs custody, as discussed infra, the indictment was sufficient to apprise the defendant of the charges against him, and that as long as customs custody is proven, the bonded nature of the cargo need not be proven.

Hagner v. U. S., 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932). It should be noted that counsel for the defense stipulated that if the cargo was of foreign origin, it should be regarded as in bond.

6. That the Philadelphia offloading order in the customs house revealed that no Weltron tapeplayer-radios were to be offloaded from the Sugura Maru in Philadelphia;

7. That the cartons found on the dock had contained Weltron tapeplayer-radios from the cargo of the Sugura Maru;

8. That those radios were being shipped from a foreign point, probably Japan to Norfolk, Virginia. All of the cargo of a foreign vessel must originate at a foreign point, since no foreign vessel may carry goods from one point in the United States to another in domestic trade under 46 U.S.C. § 883;

9. That all of the cargo of the Sugura Maru was in constructive customs custody while the ship was tied up at Pier 80. Mungo v. United States, 423 F.2d 1351 (4th Cir., 1970);

10. That the Weltron tapeplayer-radios were therefore taken from customs custody;

11. That the position of the cartons, the small number of the cartons, the fact that they were destined for Norfolk, and the nature of the merchandise admit of only one conclusion, larcenous taking;

12. That therefore the radios were taken unlawfully from customs custody in violation of 18 U.S.C. § 549;

13. That a Weltron 8-track tapeplayer-AM/FM radio of the same make and model, still bearing the original plastic bag packing on cord and earphone, was found in the trunk of a car on Pier 80 pursuant to a legitimate customs search under 19 U.S.C. § 482;

14. That defendant at the time had possession of the car and its keys;

15. That defendant at the time of the search made a spontaneous exclamation in the nature of an admission indicating knowledge that the radio was in the trunk;

16. That the defendant therefore was in possession of the radio in contemplation of law; and

17. That the circumstances surrounding the car and radio, the fact that the car was parked on Pier 80, and the inevitable knowledge of such matters resulting from defendant's experience as a longshoreman establish that defendant received the radio knowing it to have been unlawfully taken, in violation of 18 U.S.C. § 549, either by taking it himself or receiving it from another with knowledge that it was stolen cargo.

[■] The evidence received at trial supports all these contentions fully. The defendant has objected that there was no direct evidence of an actual shortage of radios aboard the Sugura Maru. While evidence of such a shortage from the Norfolk customs office records or the records of the consignee of the tapeplayer-radios would have been helpful, the taking and resultant shortage may of course be proven by circumstantial evidence provided it is strong enough to prove the point beyond a reasonable doubt. A judgment of acquittal is not required on the ground that the conclusions of this Court were contrary either to the facts or the law. However, this Court has concluded that it was error to admit some of the evidence upon which these conclusions were based.

At trial, this Court allowed testimony as to the contents of two documents by customs officials who examined them. The first document was referred to as the traveling manifest at trial and the second was referred to as the Philadelphia manifest. The testimony as to the traveling manifest established that the Sugura Maru carried a cargo including Weltron tapeplayer-radios which were bound for Norfolk, and that the manifest numbering included the numbers on the fresh cartons on Pier 80. The Philadelphia manifest established that no Weltron tapeplayer-radios were to be offloaded in Philadelphia. The defendant has argued that the manifests were the best evidence and should have been in court, and further that parole evidence was not admissible to their contents unless they

were qualified as business records by their preparer in the normal way.

As to the Philadelphia manifest, the testimony reveals that it was at the customs house in Philadelphia, and therefore should have been in court. It was, therefore, error to allow testimony as to its contents in its absence. Wigmore, Evidence, § 1178, et seq. United States v. Alexander, 326 F.2d 736 (4th Cir., 1964). Further, there was no evidence offered to establish the alleged unavailability of the traveling manifest or a certified copy thereof. It was therefore error to allow parole evidence as to the contents of this document also. However, if these were brought into court, they would probably be competent evidence as official records, without testimony as to their specific preparation, as long as the rules for authenticating official records were followed. See Wigmore, Evidence, § 1637.

To explain these conclusions in detail it is necessary to reconstruct the procedure which a foreign ship delivering foreign goods to U. S. ports must follow under the law.

19 U.S.C. § 1431 requires:

(a) The master of every vessel arriving in the United States and required to make entry shall have on board his vessel a manifest in a form to be prescribed by the Secretary of the Treasury and signed by such master under oath as to the truth of the statements therein contained. Such manifest shall contain:

First. The names of the ports or places at which the merchandise was taken on board and the ports of entry of the United States for which the same is destined, particularly describing the merchandise destined to each such port: Provided, That the master of any vessel laden exclusively with coal, sugar, salt, nitrates, hides, dyewoods, wool, or other merchandise in bulk consigned to one owner and arriving at a port for orders, may destine such cargo "for orders", and within fifteen days thereafter, but before the unlading of any part of the cargo such manifest may be amended by the master by designating the port or ports of discharge of such cargo, and in the event of failure to amend the manifest within the time permitted such cargo must be discharged at the port at which the vessel arrived and entered.

Second. The name, description, and build of the vessel, the true measure or tonnage thereof, the port to which such vessel belongs, and the name of the master of such vessel.

Third. A detailed account of all merchandise on board such vessel, with the marks and numbers of each package, and the number and description of the packages according to their usual name or denomination, such as barrel, keg, hogshead, case, or bag.

Fourth. The names of the persons to whom such packages are respectively consigned in accordance with the bills of lading issued therefor, except that when such merchandise is consigned to order the manifest shall so state.

Fifth. The names of the several passengers aboard the vessel, stating whether cabin or steerage passengers, with their baggage, specifying the number and description of the pieces of baggage belonging to each, and a list of all baggage not accompanied by passengers.

Sixth. An account of the sea stores and ship's stores on board of the vessel.

(b) Whenever a manifest of articles or persons on board an aircraft is required for customs purposes to be signed, or produced or delivered to a customs officer, the manifest may be signed, produced, or delivered by the pilot or person in charge of the aircraft, or by any other authorized agent of the owner or operator of the aircraft, subject to such regulations as the Secretary of the Treasury may prescribe. If any irregularity of omission or commission occurs in any way in respect of any such manifest, the owner or operator of the aircraft shall be liable for any fine or penalty prescribed by law in respect of such irregularity.

June 17, 1930, c. 497, Title IV, § 431, 46 Stat. 710; Aug. 8, 1953, c. 397, § 15, 67 Stat. 516.

19 U.S.C. § 1439 requires:

Immediately upon arrival and before entering his vessel, the master of a vessel from a foreign port or place required to make entry shall mail or deliver to such employee as the Secretary of the Treasury shall designate, a copy of the manifest, and shall on entering his vessel make affidavit that a true and correct copy was so mailed or delivered, and he shall also mail or deliver to such employee designated by the Secretary a true and correct copy of any correction of such manifest filed on entry of his vessel. Any master who fails so to mail or deliver such copy of the manifest or correction thereof shall be liable to a penalty of not more than $500. June 17, 1930, c. 497, Title IV, § 439, 46 Stat. 712; Aug. 8, 1953, c. 397, § 2(b), 67 Stat. 507.

Thus, the law requires a master to carry a complete and accurate original manifest and to file a copy thereof at the port of first arrival. The Court is of the opinion that the strict and detailed requirements of the law concerning the production and accuracy of this manifest render it admissible as a public record. Even though the master of a vessel is not a public official, he is discharging a public duty in the preparation and certification of this manifest. See the Opinion of L. Hand, J. in Sternberg Dredging Co. v. Moran Towing & Transp. Co., 196 F.2d 1002, (2nd Cir., 1952) and Wigmore, Evidence, § 1633(a).

19 U.S.C. § 1442 states:

Any vessel having on board merchandise shown by the manifest to be destined to a foreign port or place may, after the report and entry of such vessel under the provisions of this chapter, proceed to such foreign port of destination with the cargo so destined therefor, without unlading the same and without the payment of duty thereon. Any vessel arriving from a foreign port or place having on board merchandise shown by the manifest to be destined to a port or ports in the United States other than the port of entry at which such vessel first arrived and made entry may proceed with such merchandise from port to port or from district to district for the unlading thereof. June 17, 1930, c. 497, Title IV, § 442, 46 Stat. 713.

19 U.S.C. § 1443 states:

Merchandise arriving in any vessel for delivery in different districts or ports of entry shall be described in the manifest in the order of the districts or ports at or in which the same is to be unladen. Before any vessel arriving in the United States with any such merchandise shall depart from the port of first arrival, the master shall obtain from the appropriate customs officers a permit therefor with a certified copy of the vessel's manifest showing the quantities and particulars of the merchandise entered at such port of entry and of that remaining on board. As amended June 2, 1970, Pub.L. 91–271, Title III, § 301(b), 84 Stat. 287.

 Thus, under § 1443, the master receives from the customs officers a manifest certified by the customs officers showing what is still aboard and where it is bound, plus a permit to proceed to the ports to be visited according to a specified schedule. The Court takes this to be the "traveling manifest" referred to in the testimony. It will be noted that this is a document prepared by a U. S. official in his official capacity and is admissible as such providing the original or a certified copy is produced from the proper custody. See Wigmore, Evidence, §§ 1637, 1677. It appears that certified copies of the original manifest, and in all likelihood the traveling manifest, are on file at the U. S. Customs Office in the port of initial entry.

19 U.S.C. § 1448 provides:

(a) Except as provided in section 1441 of this title (relating to vessels not required to enter), no merchandise, passengers, or baggage shall be unladen from any vessel or vehicle arriving

from a foreign port or place until entry of such vessel or report of the arrival of such vehicle has been made and a permit for the unlading of the same issued by the appropriate customs officer: Provided, That the master may make a preliminary entry of a vessel by making oath or affirmation to the truth of the statements contained in the vessel's manifest and delivering the manifest to the customs officer who boards such vessel, but the making of such preliminary entry shall not excuse the master from making formal entry of his vessel at the customhouse, as provided by this chapter. After the entry, preliminary or otherwise, of any vessel or report of the arrival of any vehicle, the such customs officer may issue a permit to the master of the vessel, or to the person in charge of the vehicle, to unlade merchandise or baggage, but except as provided in subdivision (b) of this section merchandise or baggage so unladen shall be retained at the place of unlading until entry therefor is made and a permit for its delivery granted, and the owners of the vessel or vehicle from which any imported merchandise is unladen prior to entry of such merchandise shall be liable for the payment of the duties accruing on any part thereof that may be removed from the place of unlading without a permit therefor having been issued. Any merchandise or baggage so unladen from any vessel or vehicle for which entry is not made within forty-eight hours exclusive of Sunday and holidays from the time of the entry of the vessel or report of the vehicle, unless a longer time is granted by the customs officer, as provided in section 1484 of this title, shall be sent to a bonded warehouse or the public stores and held as unclaimed at the risk and expense of the consignee in the case of merchandise and of the owner in the case of baggage, until entry thereof is made.

Special delivery permit

(b) The Secretary of the Treasury is authorized to provide by regulations for the issuing of special permits for delivery, prior to formal entry therefor, or perishable articles and other articles, the immediate delivery of which is necessary. June 17, 1930, c. 497, Title IV, § 448, 46 Stat. 714.

 We take the unlading permit referred to in this section to be the "Philadelphia Manifest", and therefore it too would be admissible upon proof of its nature and proper custody without further qualification.

Parole evidence as to these documents should not have been allowed absent competent evidence proving their unavailability.

 It is therefore necessary to decide what course would best correct those errors. The Court feels compelled to note that the errors it made were in the decision of issues that would never have arisen had there been proper preparation on the part of the Government in this case. However, the Court is not entirely convinced that the Government might not have been able to produce sufficient competent evidence with reasonable alacrity at the time of trial to cure the defects in its case had it not relied on the rulings of this Court. Under these circumstances, it is in the discretion of the Court to grant a new trial to cure its own error, and the Court feels that this is the proper remedy in this case. A new trial is therefore ordered.