708 F.2d 587
 UNITED STATES of America, Plaintiff-Appellant,
v.
Bert R. SLOCUM and Louise V. Slocum, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bert R. SLOCUM, Louise V. Slocum, Ray B. Slocum, Doris
Fuller, Francille Miller, Defendants-Appellants.
 Nos. 81-5382, 81-5581.
 United States Court of Appeals,
Eleventh Circuit.
 June 27, 1983.
Rehearing Denied Aug. 23, 1983.
 
 Stanley Marcus, U.S. Atty., Miami, Fla., Lisa Hemmer, U.S. Dept. of Justice, Wildlife Sec., Land & Natural Resources Div., Washington, D.C., for U.S.
 Paul Morris, Miami, Fla., for Slocums, Miller and Fuller.
 Appeals from the United States District Court for the Southern District of Florida.
 Before VANCE and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 TUTTLE, Senior Circuit Judge:
 
 I. INTRODUCTION
 
 1
 Defendants Bert and Louise Slocum, husband and wife, were the owners of the Quality Bird Company ("Quality"), a Florida partnership in the business of importing and selling birds. Defendants Ray Slocum (the son of Bert and Louise), Francille Miller and Doris Fuller were employees of Quality at all times relevant to this case.
 
 The defendants were charged as follows:
 
 2
 1. Count I--All defendants except Louise Slocum conspired to enter a United States Department of Agriculture ("USDA") approved quarantine station and remove birds contained therein from customs custody or control in violation of 18 U.S.C. Sec. 371;
 
 
 3
 2. Count II--All defendants except Louise Slocum entered a USDA approved quarantine station and removed birds contained therein from customs custody or control in violation of 18 U.S.C. Secs. 2 and 549;
 
 
 4
 3. Count III--Bert Slocum knowingly received the birds so removed from customs custody or control in violation of 18 U.S.C. Sec. 549;
 
 
 5
 4. Count IV--All defendants except Louise Slocum knowingly removed birds from quarantine in violation of USDA regulations and 21 U.S.C. Sec. 134e and 18 U.S.C. Sec. 2;
 
 
 6
 5. Count V--Bert Slocum knowingly presented false indemnity claims to the USDA in violation of 21 U.S.C. Sec. 134a(e) and 18 U.S.C. Sec. 287; and
 
 
 7
 6. Count VI--All defendants except Ray Slocum conspired to violate 21 U.S.C. Sec. 134e and USDA regulations by hiding dead birds to avoid examination by USDA officials.
 
 
 8
 A jury found the defendants guilty on all counts with the exception of Count III, upon which the jury found Bert Slocum not guilty.[1] On appeal, the defendants contend: (1) that there is insufficient evidence to support their convictions; (2) that the birds allegedly removed from quarantine were not "in customs custody or control; " (3) that they are entitled to a new trial on the basis of prosecutorial misconduct; (4) that they are entitled to a new trial on the basis of newly discovered evidence; and (5) that the testimony of a former Quality employee should have been stricken as the fruit of an invalid search. We reject each of these contentions and affirm the convictions of the defendants.
 
 
 9
 The government brings a separate appeal challenging the trial court's suppression of business records seized during a search of Quality's offices. These documents would have provided an evidentiary basis for bringing additional counts against certain defendants. Because we find that the documents were properly seized pursuant to the plain view exception to the Fourth Amendment prohibition of warrantless searches, we reverse the trial court's suppression of those documents.
 
 II. THE SUFFICIENCY OF THE EVIDENCE
 A. General Background[2]
 
 10
 The USDA administers a strictly-regulated program controlling the importation of birds into the United States. The primary purpose of this program is to protect American poultry from a highly contagious disease known as Viscerotropic Velogenic Newcastle's Disease ("VVND").
 
 
 11
 As part of this program, all importers of birds are required to maintain quarantine facilities. When a shipment of birds arrives in the United States, it is met by USDA officials and transported to a sanitized quarantine facility[3] for a thirty day observation period. During the first fifteen days of the quarantine period, USDA officials work within the facility performing tests. After the fifteenth day, at least one USDA employee generally remains outside the facility during working hours making sure that no birds are transported from the facility. At the end of each workday, a lock with a USDA seal is placed on the door to the facility. At no time during the quarantine period are employees of the importer allowed within the facility unless a USDA employee is present outside the facility; the USDA employee is required to remain at the facility at all times during which an employee of the importer works therein.
 
 
 12
 If VVND is discovered in the quarantine facility during the thirty day quarantine period, the birds will be denied entry and destroyed at the importer's expense unless the importer can return the birds to the country of origin. Also, any bird that dies of any cause during the quarantine period must be turned over to the USDA for a determination of the cause of death; the cost of these post-mortem examinations is charged to the importer.
 
 
 13
 However, if the thirty day period passes without incident, the birds are released from the custody of the USDA and are usually transferred to a commercial holding facility where they are eligible for sale to the public. If VVND is found in a shipment subsequent to the release of the birds from quarantine, the birds will be destroyed but the federal government will indemnify the owner for the loss.
 
 
 14
 B. The Conspiracy To Remove Birds From Quarantine
 
 
 15
 At trial, the government introduced evidence that the defendants had conspired to violate USDA quarantine regulations during the period 1978-1980. The government's proof focused on events at Quality Bird Quarantine Station No. 1 ("Quarantine # 1") and the Quality Bird Holding Facility. The government's principal witnesses were three former employees of Quality: Richard Crumb, Billy Anthony, and Charles Dittrich.
 
 
 16
 The first alleged conspiracy, a purported scheme to smuggle diseased birds out of quarantine, commenced with the receipt by Quality of a valuable shipment of birds on December 22, 1978. This shipment, of Paraguayan origin, contained 764 birds including baby blue and gold macaws, toco toucans, and hyacinth macaws. This shipment was placed in Quarantine # 1 together with another shipment which had arrived on November 30, 1978. USDA Animal Health Aide Richard Crider was given responsibility for guarding Quarantine # 1; he testified that defendant Fuller was the Quality employee in charge of Quarantine # 1.
 
 
 17
 On January 12, 1979, the USDA informed Bert Slocum that VVND had been isolated in Quarantine # 1. Slocum was given until January 24 to arrange a return shipment to Paraguay, but his efforts failed. Crumb testified that sometime prior to January 24 he was present at a meeting attended by Fuller, Miller, Ray Slocum and other employees at which Bert Slocum stated that $100,000 of his birds had to be destroyed and "he was not going to allow it."
 
 
 18
 Crumb testified that shortly after this meeting he entered Quarantine # 1 and noticed that the hyacinth macaws were missing from the facility. He also observed Fuller placing toucans and baby blue and gold macaws in boxes, each of which she marked with a red "X." When he asked Fuller what she was doing, Fuller responded that the birds were being transported to be killed. Following Fuller's orders, Crumb stacked the boxes in the rear of the facility; sometime thereafter, Crumb and Fuller were present as Ray Slocum picked up two of the boxes and placed them in a van outside the building. Later that same day, Crumb entered the Quality holding facility[4] where he saw empty boxes, each marked with a red "X", and baby blue and gold macaws that had not been there before. Crumb destroyed the boxes as part of his duties.
 
 
 19
 Billy Anthony and Charles Dittrich testified about a separate quarantine violation at Quarantine # 1. On January 23, 1979, the day prior to the scheduled extermination of the birds, Dittrich, on Bert Slocum's orders, instructed Anthony to prepare several extra cages in the holding facility. When he reported to work the next day, January 24, Anthony immediately noted an increase in the amount of noise emanating from the holding facility. Upon entering the facility, he saw several empty boxes scattered about the floor of the facility which had not been there when he departed the previous day. There was also a marked increase in the number of hyacinth macaws, toco toucans and blue and gold macaws contained in the facility. Most of the blue and gold macaws were so young that they had to be hand-fed and one of the toucans had a broken beak; Anthony testified that he recalled hand-feeding a toco toucan with an identical beak in Quarantine # 1 in the days immediately prior to the extermination. The next day, when Anthony asked Miller how the birds got into the holding facility from Quarantine # 1, she responded, "I went in through the front door." Dittrich also recalled seeing extra cages of hyacinth macaws in the holding facility on the morning of the 24th.
 
 
 20
 The government presented evidence that the screws securing the hinges of the sealed door to Quarantine # 1 were easily accessible from the outside. Furthermore, an employee of the Honeywell Protection Service testified that Quality never activated its alarm system at Quarantine # 1 the night of the 23rd.
 
 
 21
 On the morning of the 24th, Anthony became apprehensive when he observed a USDA inspector on the premises. He asked Ray Slocum how he should respond if anyone inquired about the extra birds in the holding facility. Ray Slocum told Anthony and Dittrich to reply that a new shipment had arrived from California. Dittrich, Quality's primary salesperson, testified that the company was not expecting any birds from California.
 
 
 22
 Meanwhile, the extermination had commenced in Quarantine # 1. Dr. Angel Paz, a USDA veterinarian, arrived at the facility around 11:30 a.m. to supervise the procedure. When he arrived, Quality employees appeared to have already killed and bagged several of the large birds. Paz testified that he did not reopen the bags due to time pressures and the costs of the materials involved. Paz stated that either Fuller or Miller was present at the time, but he could not recall which one. Anthony later testified that Fuller was working in Quarantine # 1 that day.
 
 
 23
 Gary Henderson, a pet shop owner from Houston, visited Quality on January 24. He testified that hyacinth macaws were selling for less than half their usual price, but that he did not purchase any because they appeared languid. Bert Slocum told him that they had just been released from quarantine and urged that this accounted for their appearance. Evidence was also introduced that Quality conducted its first "Open House" ever in February 1979, during which it offered birds at reduced prices.
 
 
 24
 On March 12, 1979, Bert Slocum informed USDA officials that the birds in the Quality holding facility appeared ill. Subsequent tests detected VVND, and the USDA ordered that all birds in the holding facility be destroyed. The government reimbursed Quality for $288,682, the value of the birds in the facility. Included among the exterminated birds were thirty-eight blue and gold macaws (valued at $950 each), twenty-two hyacinth macaws ($2800 each), and thirteen toco toucans ($595 each).
 
 
 25
 The government introduced documentary evidence intended to prove that the large numbers of certain categories of birds in the holding facility could only be accounted for by illegal releases of birds from quarantine. From January 1978 until March 1979, Quality only released seven blue and gold macaws and three toco toucans from quarantine into the holding facility. Furthermore, Quality's records showed no domestic purchases of those birds during this same period. This evidence appears especially compelling given the consistent testimony that the holding facility in 1979 contained numerous baby blue and gold macaws, birds that could not possibly have remained in the holding facility since January 1978.
 
 
 26
 Both the government and the defendants introduced expert scientific testimony in an effort to establish the source of the VVND that was introduced into the holding facility. By testing the levels of VVND virus and naturally-produced antibodies in various species of contaminated birds in the holding facility, Dr. Daryl King, a government expert, concluded that the hyacinth and blue and gold macaws had transmitted the disease into the holding facility. These birds exhibited high levels of antibodies and low levels of disease which indicated that a substantial amount of time had lapsed since their exposure to the disease.[5] Cockatiels, on the other hand, which had been moved into the holding facility in February 1979, showed high levels of disease and an absence of antibodies, an indication that these birds had only recently been exposed to the disease and could not have transmitted it into the facility. Furthermore, Dr. Blair McMillen, another government expert, testified that the strains of VVND discovered in Quarantine # 1 and the holding facility were identical; there are 30 separate strains of VVND.
 
 
 27
 Dr. Jack Gaskin testified for the defense. He urged that the government's theory of transmission was implausible since Quality's cockatoos, among the birds most susceptible to VVND, showed no signs of VVND despite being positioned only five to seven feet from the macaws in the holding facility. Cockatiels, on the other hand, a less susceptible species, tested positive for the disease even though they were stored two rooms away from the macaws. Gaskin stated that the disease was more likely introduced by two maroon belly conures which were allegedly returned from a pet store in Key West in March.[6]
 
 
 28
 Finally, in January 1980, Bert Slocum told Anthony that he was aware that Anthony knew about the "break-in." He also told Anthony that he did not know where the government was getting its information on Quality's activities.
 
 C. The Conspiracy To Conceal Dead Birds
 
 29
 Anthony testified that on his first day at Quality, defendant Miller informed him that it was "normal procedure" to hide birds that had died in quarantine rather than turn them over for inspection by the USDA. Fuller likewise informed Crumb of the various methods of disposing of such birds. Acceptance of this practice was so widespread at the company that employees often exchanged "dead bird stories" during lunch. Anthony further testified that Bert Slocum informed him on more than one occasion that Quality was responsible for the cost of autopsies conducted on dead birds.
 
 
 30
 Anthony related several instances in which dead birds were concealed. These means of disposal, participated in by Bert and Louise Slocum and Francille Miller, included flushing birds down the toilet, placing them in the garbage, and propping them onto perches so that they appeared alive. Anthony testified regarding Louise Slocum's presence during two such instances, including one in which she hid dead birds in her pocketbook to avoid detection by USDA officials at the Miami Airport.
 
 D. Discussion
 
 31
 The defendants contend that insufficient evidence was presented at trial to support their convictions for conspiracy and substantive violations of USDA regulations. As a reviewing court, we must view the facts and draw all reasonable inferences therefrom in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1940); United States v. Davis, 679 F.2d 845, 852 (11th Cir.1982). Furthermore, all credibility choices must be made in favor of the finder of fact. United States v. Smith, 700 F.2d 627, 632 (11th Cir.1983); United States v. Gianni, 678 F.2d 956, 958-9 (11th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 491, 74 L.Ed.2d 633 (1983). Interpreting the evidence in this manner, the applicable standard of review is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir., Unit B, 1982) (en banc).[7]
 
 
 32
 We turn first to the conspiracy convictions. To obtain a conspiracy conviction, the government must present proof beyond a reasonable doubt that a conspiracy existed, that the defendant knew of the conspiracy, and that the defendant intended to join or associate himself with the conspiracy's objectives. United States v. Thevis, 665 F.2d 616 (5th Cir., Unit B, 1982), cert. denied, 456 U.S. 1008, 102 S.Ct. 2300, 3489, 73 L.Ed.2d 1303 (1982), --- U.S. ----, 103 S.Ct. 57, 74 L.Ed.2d 61 (1983). These essential elements of a conspiracy may be established by circumstantial as well as direct evidence. United States v. Tolliver, 665 F.2d 1005, 1007 (11th Cir.), cert. denied, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982). "[C]ircumstantial evidence may be used to prove a conspiracy without ever showing the existence of any formal agreement..." United States v. Caicedo-Asprilla, 632 F.2d 1161, 1166 (11th Cir.1980), cert. denied sub nom., Cantero-Duyos v. United States, 450 U.S. 1000, 101 S.Ct. 1707, 68 L.Ed.2d 201 (1981).
 
 
 33
 We quickly dispose of the defendants' challenge to the jury's finding that each of them participated in a conspiracy to conceal dead birds from USDA inspectors. Accepting as we must the veracity of government witnesses Anthony and Crumb, the jury was certainly entitled to find that such concealment was standard policy at Quality and that each of the four alleged co-conspirators took active steps in furtherance of the conspiracy to conceal dead birds. The widespread pattern of concealment and the money-saving motivation behind the concealment lend credence to the apparent inference drawn by the jury that these actions were pursuant to an agreement among the accused.
 
 
 34
 Turning now to the conspiracy to remove birds from customs custody or control, there can be little question that the jury acted within its proper function when it found Miller, Fuller, and Bert and Ray Slocum guilty of such a conspiracy. The primary contention of the defendants, that the government failed to show the existence of an agreement among the co-conspirators, ignores the oft-cited adage of the Supreme Court that a common purpose and plan may be inferred from a "development and a collocation of circumstances." Glasser, 315 U.S. at 80, 62 S.Ct. at 469.[8] Once the jury concluded that certain birds had been improperly transferred from Quarantine # 1 to the holding facility (an inarguably valid conclusion given the overwhelming evidence thereof), it follows naturally that one or more of the Quality employees must necessarily have been involved in the transfer operation. The inculpatory statements by Bert Slocum, Ray Slocum and Miller to the government witnesses coupled with the suspicious actions of the Slocums and Fuller were certainly sufficient to support an inference that they participated in, or at least tacitly associated themselves with, the illegal operation.
 
 
 35
 The defendants contend that each of their actions and statements might just as easily be interpreted to support an inference of innocence. For example, Bert Slocum's assertion that he was "not going to allow" the extermination of his birds might simply have been a statement of his intent to attempt to return a shipment to Paraguay. While this is true, "it is not necessary [for a criminal conviction] that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. A jury is free to choose among reasonable constructions of the evidence." Bell, 678 F.2d at 549. Moreover, the defendants' supposition that the jury must consider each piece of evidence individually and discard those fragments which do not of themselves support an inference of guilt beyond a reasonable doubt is patently incorrect. On the basis of the evidence as a whole, we conclude that the jury could properly find beyond a reasonable doubt that the defendants participated in the conspiracy.[9]
 
 
 36
 All defendants except Louise Slocum are also charged with dual substantive counts of unlawfully entering a quarantine station and removing objects therein from customs custody or control and unlawfully removing birds from quarantine. The elements of such violations are: (1) that something was removed from customs custody/control or from quarantine; (2) that the removal was unlawful, i.e. done with felonious intent; (3) that the defendant removed or aided and abetted in the removal of the article; and (4) that the defendant knew the article was unlawfully taken. United States v. McNair, 341 F.Supp. 919, 921 (E.D.Pa.1972), aff'd without opinion, 475 F.2d 1397 (3d Cir.1973).[10] Based on the evidence adduced at trial and our previous discussion of the actions and statements which link the various defendants to the conspiracy to remove birds from quarantine, we find that the government sufficiently proved the existence of each of the above elements as to each defendant and that the jury thus made a reasonable finding of guilt.
 
 
 37
 Finally, Bert Slocum was convicted of filing fraudulent indemnity claims in violation of 21 U.S.C. Sec. 134a(e) and 18 U.S.C. Sec. 287. Slocum asserts that the jury could not reasonably have concluded that the VVND discovered in the holding facility had in fact appeared there as the result of the illegal transfer of birds from quarantine. Slocum notes especially that two strains of VVND were located in the holding facility, one of which was different from the strain discovered in Quarantine # 1.
 
 
 38
 Unfortunately for Slocum, his argument misses the point. The trial court correctly charged the jury on the elements of a violation of 18 U.S.C. Sec. 287:
 
 
 39
 First: That the defendant made or presented a false, fictitious, or fraudulent claim to a department of the United States;
 
 
 40
 Second: That the defendant knew such claim was false, fictitious, or fraudulent;
 
 
 41
 Third: That the defendant did so with the specific intent to violate the law or with a consciousness that what he was doing was wrong.
 
 
 42
 See United States v. Computer Sciences Corp., 511 F.Supp. 1125, 1134 (E.D.Va.1981), rev'd on other grounds, 689 F.2d 1181 (4th Cir.1982). On the "Appraisal and Indemnity Claim" forms filed with the government, Slocum affixed his signature beneath the certification, "I make claim for all amounts due me in accordance with all applicable laws and regulations governing the payment of indemnity for the animals ... to be destroyed..." This statement was made with specific knowledge that diseased animals had been improperly introduced into the holding facility and that payment was being received for such animals in clear violation of 21 U.S.C. Sec. 134a(e) which provides, "No [indemnity] payments shall be made ... for any animal ... which has been moved or handled by the owner thereof or his agent knowingly in violation of a law or regulation administered by the Secretary [of Agriculture] for the prevention of the interstate dissemination of communicable disease." Because Slocum signed the indemnity claims forms with knowledge that he was requesting payment for birds which had been illegally introduced into the holding facility, we find that the above elements have been satisfied and affirm his conviction on this count.
 
 III. CUSTOMS CUSTODY OR CONTROL
 
 43
 The defendants also challenge their convictions under 18 U.S.C. Sec. 549 on the ground that the birds were not still in "customs custody or control" on January 23, 1979, the day they were removed from quarantine. Section 549 provides in pertinent part:Whoever, maliciously enters any bonded warehouse or any vessel or vehicle laden with or containing bonded merchandise with intent unlawfully to remove therefrom any merchandise or baggage therein, or unlawfully removes any merchandise or baggage in such vessel, vehicle, or bonded warehouse or otherwise in customs custody or control ... [s]hall be fined not more than $5000 or imprisoned not more than two years, or both.
 
 
 44
 (Emphasis added). This Court has stated that "imported goods are in the constructive custody of customs from the moment of their arrival in a United States port until their formal release by the Customs Service, regardless of whether customs has actual, physical possession." United States v. Harold, 588 F.2d 1136, 1142 (5th Cir.1979). In United States v. Garber, 626 F.2d 1144, 1155 (3d Cir.1980), cert. denied 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981), the Third Circuit held that an item is not "released" from customs control "until it has been inspected, examined, or appraised and is reported by the appraiser to have been truly and correctly invoiced and found to comply with the requirements of the laws of the United States." (Quoting 19 U.S.C. Sec. 1499).
 
 
 45
 Suffice it to say that a shipment of birds discovered to carry VVND and thus condemned to extermination does not comply with the laws of this country; USDA regulations specifically state:
 
 
 46
 If [imported] birds are found free of evidence of communicable diseases of poultry during quarantine, then the port veterinarian should issue an agriculture release for entry through U.S. Customs. If the birds are found during port of entry inspection or during quarantine to be infected with or exposed to a communicable disease of poultry, such birds shall be refused entry...
 
 
 47
 9 C.F.R. Sec. 92.11(e). The birds were thus never released from customs and remained under customs custody or control at all times up till their illegal removal from the quarantine station.
 
 
 48
 The defendants also contend that the trial court erred in not giving a jury instruction as to the meaning of "formal release." Without deciding whether the failure of the court to give the instruction constituted error, we conclude that the absence of such instruction in the present case was certainly harmless given the overwhelming evidence that the birds were removed from customs control.
 
 IV. PROSECUTORIAL MISCONDUCT
 
 49
 During the course of the government's cross-examination of Lillian Ward, the bookkeeper for Quality, the following exchange occurred between the government prosecutor and Ward:
 
 
 50
 Q: (Prosecutor) Did Mr. Slocum ever ask you to falsify veterinary certificates for shipment of birds to Canada?
 
 
 51
 A: (Ward) Yes.
 
 
 52
 Q: Did you do that for him?
 
 
 53
 A: Yes.
 
 
 54
 The trial court denied the defendants' motion for a mistrial. The defendants now contend that the trial court erred in denying the motion since Ward's responses to the prosecutor's questions impaired their right to a fair trial by implying that Quality's operations were generally conducted in an unlawful manner, particularly with respect to the actions of Bert Slocum.
 
 
 55
 Our inquiry would usually commence with a consideration of whether the evidence of prior falsification of documents was properly admissible under the Federal Rules of Evidence. However, we need not pursue this analysis in the present case since it is apparent that the evidence, whether admissible or not, had no substantial impact on the jury's deliberations.
 
 
 56
 Immediately following witness Ward's response to the second question, defense counsel approached the bench and moved for a mistrial. The court excused the jury and subsequently conducted an individual poll of each member of the jury.[11] The court also allowed attorneys for the government and the defendants to question individual jurors. In response to the court's questions, seven of the jurors stated unequivocally that they could give the question and answer no consideration in their deliberations, and four other jurors did not remember the exchange. The single juror who expressed some hesitancy regarding her ability to disregard the statement was mugged midway through the jury deliberations and did not participate in the verdict; the parties consented to an eleven juror panel.
 
 
 57
 When the entire jury returned from the jury room, the judge addressed them:
 
 
 58
 Ladies and Gentlemen, I have polled you individually and I now am satisfied beyond and to the exclusion of a reasonable doubt that you all will follow the court's instructions and completely disregard the last question and answer before we allowed you to recess as pertains to arriving at any decision in this case ... as to the facts and also as far as weighing the testimony, that question and answer, as far as weighing the testimony of that witness...
 
 
 59
 Without further objection from the defense attorneys, the trial continued.
 
 
 60
 An instruction to disregard evidence withdrawn from the jury is sufficient grounds for an appellate court to uphold a trial court's denial of a motion for mistrial unless the evidence is so highly prejudicial as to be incurable by the trial court's admonition. United States v. Walker, 621 F.2d 163, 168 (5th Cir.1980), cert. denied 450 U.S. 1000, 101 S.Ct. 1707, 68 L.Ed.2d 202 (1981); United States v. Klein, 546 F.2d 1259, 1263 (5th Cir.1977). Such a level of prejudicial effect exists where there is "a significant possibility ... that ... the stricken statement had a substantial impact upon the verdict of the jury." United States v. Arenas-Granada, 487 F.2d 858, 859 (5th Cir.1973).
 
 
 61
 In the present case, several factors require us to uphold the district court's action. First, the court conducted the most careful possible inquiry of individual jurors to determine the impact that the statement might have had on their ability to judge the facts impartially. Second, four of the jurors did not even recall the question while the remaining seven jurors expressed absolute certainty as to their ability to disregard the question. (In this regard, we note that defense counsel did not request the trial court to replace a single juror with an alternate juror). Third, though the evidence against the defendants could certainly not be characterized as overwhelming, strong evidence existed in support of the conviction of Bert Slocum, the defendant most likely to have been prejudiced by the prosecutor's questions. In sum, we discern no grounds for concluding that the disputed comments had a substantial impact on the jury's deliberations.[12]V. NEWLY DISCOVERED EVIDENCE AND BRADY VIOLATION
 
 
 62
 The defendants contend that the district court erred in denying, without a hearing, their motion for a new trial based on (1) the post-conviction discovery of new evidence, and (2) an allegation that the government failed to bring exculpatory evidence to the attention of the defendants in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[13] Both of these grounds for the new trial motion are based on post-conviction "statements" of employees of Quality or the USDA.
 
 
 63
 The first such statement was a June 1, 1981, letter from Charles Crider, a USDA employee who guarded Quarantine # 1 during certain time periods relevant to this appeal, to Judge James W. Kehoe, the trial judge in this case. In the letter, Crider, who testified on behalf of the government, asserted that he had been present at Quarantine # 1 during all working hours from the time of the arrival of the December 22 bird shipment until he was relieved of his duties on January 12. He wrote that he had never seen government witnesses Crumb and Anthony at Quarantine # 1 and denied that he had ever slept on the job. These assertions were directly contrary to the testimony of government witnesses. Crider also stated that he had informed government prosecutors of these observations prior to trial.
 
 
 64
 The second statement was a May 28, 1981, letter to Judge Kehoe from William Tharp, a former employee of Quality. Tharp, who did not testify at trial, informed Judge Kehoe that both Anthony and Crumb had told him prior to their grand jury testimony of their strong dislike for Bert Slocum and indicated their intent to lie if necessary to see him convicted. Tharp also wrote that just before Crumb's grand jury testimony, Crumb asked him to explain what a hyacinth macaw looked like since Crumb had never seen one. Finally, Tharp stated that Customs agents indicated that Tharp might be able to secure an undercover job with Customs if his testimony proved favorable to the government.
 
 
 65
 The final statement was contained in the defendants' June 4, 1981, Motion to Continue Sentencing.[14] In that motion, counsel for the defendants stated that Sylvia Sakaleros, the USDA employee who was stationed at Quarantine # 1 on January 23-24, 1979, was prepared to testify that she had observed baby blue and gold macaws in Quarantine # 1 on the morning of January 24 and that she did not on that morning notice any decrease in the number of birds in that facility or in the amount of noise emanating from the facility. She would also allegedly testify that she heard the screams of macaws as they were killed and that she had never seen Crumb or Anthony in the quarantine facility. Finally, she would assert that she had not come forward earlier because she had been threatened with the loss of her job.
 
 
 66
 We may dispose of the Brady challenge and the newly-discovered evidence challenge on identical factual grounds. This Court has stated that the government, when presented with a general request for material, "is not obligated under Brady to furnish a defendant with information which the defendant already has or, with any reasonable diligence, the defendant could obtain himself." United States v. Prior, 546 F.2d 1254, 1259 (5th Cir.1977); United States v. Brown, 628 F.2d 471, 473 (5th Cir.1980); United States v. Campagnuolo, 592 F.2d 852, 861 (5th Cir.1979). Likewise, it is well-established that newly-discovered evidence does not warrant a new trial unless: (1) the evidence is discovered following trial; (2) the movant demonstrates due diligence to discover the evidence prior to trial; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that it would probably produce a different result at a new trial. Bentley v. United States, 701 F.2d 897, 898 (11th Cir.1983); United States v. Mesa, 660 F.2d 1070, 1077 (5th Cir., Unit B, 1981).
 
 
 67
 In the present case, the defendants have failed to demonstrate prior due diligence in uncovering this "newly-discovered" evidence. Charles Crider testified at trial. William Tharp, according to his letter, testified before the grand jury and, as a former employee of Quality, was surely known to the defendants. Sylvia Sakaleros did not testify at trial, but the government apparently spoke with her prior to trial and the defendants present no justification for their failure to do the same. In fact, during closing argument, one of the defense counsel, in the course of noting the government's failure to call Sakaleros as a witness, commented to the jury, "I am not suggesting to you that I could not find Sylvia Sakaleros if I wanted to, but I am suggesting to you that the responsibility, the burden of proof is not mine." In these circumstances, the defendants have absolutely failed to justify their failure to bring this purportedly new evidence to the attention of the jury in the course of the trial.[15]
 
 
 68
 The defendants further assert that, at a minimum, they were entitled to an evidentiary hearing on the Brady and newly-discovered evidence allegations. The decision of the trial court not to hold such a hearing is within the trial court's sound discretion, subject to review only for an abuse of that discretion. United States v. Johnson, 596 F.2d 147, 148 (5th Cir.1979); United States v. Hamilton, 559 F.2d 1370, 1373 (5th Cir.1977). In the case before us, where we find ourselves in agreement with the decision on the merits of the new trial motion and where the defendants failed to file even an affidavit by Sylvia Sakaleros, the person whose post-trial statement clearly came the closest to requiring a new trial, we hold that the trial court did not abuse its discretion in denying the motion without an evidentiary hearing.
 
 
 69
 VI. THE MOTION TO SUPPRESS RICHARD CRUMB'S TESTIMONY
 
 
 70
 Following Richard Crumb's testimony, defense counsel for Bert Slocum moved to strike the testimony and to prevent other former Quality employees from testifying on the grounds that the addresses of the employees had been improperly seized by the government during a search of Quality's offices. The court denied the motion as to Crumb, but granted it as to other employees of Quality who had not yet testified. The defendants now contend that the trial court should have stricken Crumb's testimony or, at a minimum, have conducted a hearing to determine whether the means by which the government located Crumb were tainted by an illegal seizure.
 
 
 71
 We need not reach the merits of the defendants' contention. Fed.R.Crim.P. 12(b)(3) states that a motion to suppress evidence must be raised prior to trial. Fed.R.Crim.P. 12(f) holds that failure to raise such a motion in a timely manner constitutes a waiver, though "the court for cause may grant relief from the waiver."
 
 
 72
 We have noted the broad discretion bestowed on a trial court in deciding whether to recognize cause for a failure to make a timely motion. United States v. Echols, 577 F.2d 308, 311 (5th Cir.1978), cert. denied 440 U.S. 939, 99 S.Ct. 1288, 59 L.Ed.2d 499 (1979). In the present case, where Slocum's counsel presented no justification for his failure to discover the alleged taint prior to trial and the testimony had already been entered into evidence, we are unable to find that the court abused its discretion in declining to grant the defendants' motion.[16]
 
 VII. THE SEARCH OF QUALITY'S OFFICES
 A. Introduction
 
 73
 The government brings a separate appeal alleging that the district court erred in suppressing certain documents discovered during the course of a January 1980 search of Quality's offices. The suppression of these documents required the government to drop Counts VII and VIII against Bert and Louise Slocum which alleged an illegal double invoicing scheme in violation of 18 U.S.C. Sec. 542.
 
 
 74
 The warrant authorizing the search of Quality's offices was based on information contained in an affidavit by Special Agent Michael O'Riorden of the U.S. Customs Service. Paragraph A of Exhibit A of the warrant authorized the seizure of eleven specific categories of business documents;[17] these categories related primarily to particular species of birds and provided dates for relevant transactions involving such birds. Four of the eleven categories did not cite dates but referred to specific paragraphs of the affidavit which in turn made reference to general dates of transactions involving particular species of birds. The earliest date mentioned in the warrant was May 2, 1977.[18]
 
 
 75
 Prior to the search, Agent O'Riorden met with the agents who would participate in the search. Copies of the warrant and the affidavit were disbursed and O'Riorden suggested that each agent read these documents. O'Riorden then read Exhibit A aloud, informed the agents precisely what they should be looking for, and revealed to them the crimes of which the defendants were suspected.
 
 
 76
 The agents then proceeded to Quality where they served the warrant and entered the offices. Several agents testified that the offices were a shambles and that there was no apparent filing system; it was therefore concluded that it would be necessary to view each document to determine if it fell within the warrant.
 
 
 77
 When an agent discovered a document that he or she believed covered by the warrant, the document was taken to one of four supervising agents who made the ultimate decision whether to seize the document. Though each agent did not possess a copy of the warrant and affidavit as the search was conducted, copies of both were available in the room and the ultimate decision to seize was based on the language of the warrant.
 
 
 78
 The evidence in dispute on this appeal is a folder and two sets of documents labeled respectively as SH-5, SH-6 and SH-7. Agent Thomas Smith of the Customs Service discovered the folder, SH-5, on a bookshelf behind Bert Slocum's desk. The only marking on the outside of the folder was the name "Misri Persaud" and the first document contained therein was dated 1978. As Smith perused the other documents in the folder to ascertain if any referred to birds mentioned in the warrant, he noted two consecutive forms dated "7.10.75" which listed numerous birds imported from Guyana on that date. The forms were identical except for the prices listed for each species of bird; only the form with the lower-priced birds was marked with a USDA seal. Immediately alerted to a double invoicing scheme whereby an artificially deflated price is submitted to Customs for tariff calculation, Smith alerted O'Riorden who ordered the document (eventually labeled SH-6) seized.
 
 
 79
 Continuing his examination of the file, Smith came across a similar invoice listing birds which had been imported on "10-2-76." Though none of the birds listed were cited in the warrant, Smith observed a typewritten note to Bert Slocum at the bottom of the form which read: "Please send one Cheque for Custum value $2; 800 00 and the reast ni a nother Cheque from Bank I am laveing Hawks eagle for you To Price." (sic). The note was signed "M. Persaud." Again alerted by Smith to evidence of double invoicing, O'Riorden seized the document and successive pages which were clipped to it (SH-7).
 
 
 80
 The folder containing these incriminatory documents was subsequently examined by Customs Agent Valerie Rheinehart.[19] She discovered several more documents which she thought were either covered by the warrant or presented evidence of a double invoicing scheme. She marked each such document with a paper clip and presented the entire folder to O'Riorden. After briefly examining the marked documents, O'Riorden seized the entire folder (SH-5).
 
 
 81
 The defendants brought a motion before a federal magistrate to suppress these documents. The government contended that the evidence of double invoicing was properly seized pursuant to the plain view exception to the presumption against warrantless searches. However, the magistrate recommended that the evidence be suppressed since the "document[s] seized therein were not within a reasonable period of time set forth in either the affidavit or in the search warrant. The affidavit speaks of the earliest date of May 2, 1977, and any search should have been limited to a reasonable time before or after that date."
 
 
 82
 The trial court accepted the magistrate's recommendation, but the grounds for the court's ruling were somewhat unclear. The court stated, "It is my ruling that notwithstanding the time factor involved and notwithstanding the defendant's contention, all of the rules are affirmed without affirming any theory as to relevancy as to time and the insufficiency of the description as to time." The court therefore expressly declined to rely on the magistrate's grounds for suppression without advancing any alternative grounds. However, since the failure of the plain view exception was the only other theory seriously advanced by the defendants which would merit a suppression of these documents without invalidating the entire search,[20] we will presume the trial court acted on the assumption that the plain view exception did not apply in the present case. Since we conclude that this assumption was erroneous and that the search was reasonably conducted as to the dates on particular documents, we overturn the suppression order as to SH-5, SH-6 and SH-7.
 
 B. The Dates of the Documents
 
 83
 The magistrate apparently recommended suppression on the grounds that the agents need have examined a particular document no further than the date at the top of the document if the date listed was prior to May 2, 1977, the earliest date of any transaction specified in the warrant. Though prior federal case law provides little guidance on this question, we conclude in the circumstances of this case that federal agents acted reasonably in examining documents dated less than two years prior to this 1977 date.
 
 
 84
 The lengthy affidavit of Agent O'Riorden (dated January 18, 1980) filed in support of the search warrant contains substantial evidence of an ongoing conspiracy to import birds and to dispose of dead birds in violation of federal law. The specific dates of the substantive offenses averred in the affidavit ranged from May 2, 1977, to November 23, 1979, less than two months prior to the affidavit. Given this evidence of criminal activity ranging over a two and one-half year period and the fact that the purported violations concerned the importation of specific species of birds, we conclude that the agents acted reasonably in examining documents dated 1975 to determine if the documents pertained to those species of birds and thus provided some information as to the genesis and formation of the alleged conspiracy and the intent to perform illegal substantive acts.[21]
 
 
 85
 A similar conclusion was reached in United States v. Zanche, 541 F.Supp. 207 (W.D.N.Y.1982). In that case, a warrant was issued on an affidavit alleging that employees of a certain business were falsifying postal records relevant to determining postage costs. The warrant authorized the seizure of nine particular types of business records, but did not list any dates to guide agents in examining the records. The defendants sought to suppress on the grounds that the absence of dates transformed the warrant into an invalid general warrant.
 
 
 86
 The court rejected this contention noting that federal courts have often approved warrants for examination of business records despite the absence in the warrant of specific dates for such records. 541 F.Supp. at 210.[22] The court concluded, "[I]f the fraud operation under investigation was ongoing, evidence of illegal activity in the past would be relevant to the conspiracy, while records of legitimate transactions prior to the conspiracy will help determine how and when the fraud scheme began." Id. These same considerations apply with equal weight in the case before us.
 
 
 87
 We are not faced here with a broad warrant authorizing "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 20 L.Ed.2d 564 (1971). The warrant very specifically stated that documents pertaining to particular transactions involving particular species of birds may be seized.[23] On the facts before us, where government agents merely examined documents dated less than two years prior to transactions specified in the warrant to determine if the documents might in some manner relate to those transactions, it does not appear that the government agents acted in an unlawful manner.
 
 C. The Plain View Exception
 
 88
 Since SH-6 and SH-7 did not list any birds cited within the warrant, the government was forced to justify their seizure based on an exception to the Fourth Amendment's prohibition of warrantless searches and seizures. The government contends that these items satisfied the plain view exception.
 
 
 89
 The Supreme Court first recognized this exception in Coolidge. The Court stated that three conditions must be satisfied before an item not specified in the warrant could be seized under this exception. First, the searching agents must lawfully be in a position to view the disputed evidence. Second, the searching agents must inadvertently discover the disputed evidence. Third, the incriminating nature of the disputed evidence must be immediately apparent on its face. 403 U.S. at 464-73, 91 S.Ct. at 2037-42. We now consider each of these requirements as they apply to SH-6 and SH-7.
 
 
 90
 First, were the agents lawfully in a position to view the documents? Since the agents' right to search Quality's offices was not contested on appeal, this question focuses more specifically on whether the agents were entitled to read the disputed documents or even to search within the folder marked "Misri Persaud."
 
 
 91
 As an initial matter, the agents were clearly entitled to subject each document in the office to some degree of examination; given the disheveled state of the offices and the apparent absence of any filing system, this was clearly the only means of determining whether a particular document fell within the warrant.[24] Therefore, it is clear that the agents had the right to look within the Misri Persaud file and to examine each document therein; our task is to determine the extent of the perusal authorized by the search warrant.
 
 
 92
 This Court has never considered the question of the proper breadth of an officer's examination of a document pursuant to a search warrant authorizing the seizure of documents. In a similar factual situation, the U.S. Court of Appeals for the District of Columbia held that an officer acting pursuant to such a warrant is entitled to examine any document he discovers, but that "the perusal must cease at the point of which the warrant's inapplicability to each document is clear." United States v. Heldt, 668 F.2d 1238, 1267 (D.C.Cir.), cert. denied, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). Likewise, in a search of documents incident to an arrest, the Second Circuit wrote that "some perusal, generally fairly brief, was necessary in order for police to perceive the relevance of the documents to the crime." United States v. Ochs, 595 F.2d 1247, 1258 (2d Cir.), cert. denied 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).[25] This common sense standard seems a prudent one to follow in this Circuit.[26]
 
 
 93
 Since we have rejected the magistrate's application of the strict date criteria for a determination of the warrant's applicability to particular documents,[27] it obviously was necessary for Agent Smith to read the lists of birds in the invoices constituting SH-6 and SH-7 in order to determine if the invoices related to the importation of birds mentioned in the warrant. Furthermore, given the brevity of the note at the bottom of the first page of SH-7 and the fact that the note contained the name of a species of bird, Agent Smith acted reasonably when he skimmed that note. Also, our review of the record did not uncover any facts which would indicate that Agent Rheinehart's examination of the file exceeded the scope permissible under the warrant. We thus conclude that the agents were lawfully in a position to view the evidence of the double invoicing scheme.
 
 
 94
 Second, we must decide whether the discovery of the evidence was inadvertent. There is no evidence in the record that the searching agents were cognizant of the existence of these documents or of the participation by Quality in a double invoicing scheme. Therefore, the search and seizure of these documents satisfies the second prong of the plain view test.
 
 
 95
 Third, was the evidence incriminating on its face?[28] In answering this question, it is critical to remember that a law enforcement official making evaluations is not bound to the objective knowledge of a reasonable person. Such an agent may rely on his special experience and knowledge in determining whether, for example, reasonable suspicion or probable cause exists. United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("A trained officer draws inferences and makes deductions--inferences and deductions that might well elude an untrained person.").
 
 
 96
 With this in mind, there can be no doubt that Agent Smith was immediately aware of the evidence of wrongdoing before him when he observed SH-6 and SH-7. He testified that, as a Customs agent, he had substantial experience with schemes of this sort and had been trained to detect them. The disparately-priced invoices and the note requesting a "Cheque for Custums value" (sic) would certainly have alerted an experienced agent to the illegal scheme.
 
 
 97
 The defendants' argument that the seizure was invalid since the seizing officers could not know that a crime had been committed until they compared the seized documents with documents actually submitted to Customs is unavailing. In United States v. Wood, 560 F.2d 660, 664 (5th Cir.1977), cert. denied 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978), this Court stated, "There is no rule of law which requires an officer to know with absolute certainty that all elements of a putative crime have been completed when he seizes an article which reasonably appears to be incriminating evidence." See also Duckett, 583 F.2d at 1314. Officer Smith's reasonable conclusion that the documents were incriminating on their face was sufficient to satisfy the third prong of the Coolidge test.
 
 
 98
 Finally, we must determine whether the seizure of the entire Misri Persaud file (SH-5) was a reasonable seizure. As noted, Agent Rheinehart brought the folder to O'Riorden and directed his attention to several documents contained therein which she felt were either within the warrant or were incriminating on their face. After quickly reviewing the marked documents, O'Riorden ordered the entire Persaud file seized. The seizure occurred after O'Riorden had already seized SH-6 and SH-7 out of that same folder.
 
 
 99
 Thus, once presented with Rheinehart's findings, O'Riorden had substantial evidence that Persaud and employees of Quality Bird had acted on numerous occasions to violate federal law. In these circumstances, to require a seizing officer to examine individually each document within a file or bound volume "would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search." United States v. Wuagneux, 683 F.2d 1343, 1353 (11th Cir.1982), quoting United States v. Beusch, 596 F.2d 871, 876 (9th Cir.1979). Since the individual documents contained in the file could be legitimately seized under the plain view exception, Agent O'Riorden acted reasonably in ordering the seizure of the entire file and thereby limiting the time necessary to conduct the search of Quality's offices.
 
 
 100
 Therefore, we conclude that the trial court erred insofar as it held that the seizure of SH-6 and SH-7 and the file containing those documents did not meet the plain view exception as outlined in Coolidge and was not otherwise a reasonable exercise of the searching officers' discretion.
 
 VIII. CONCLUSION
 
 101
 The conviction of the defendants in Case No. 81-5581 is AFFIRMED. The suppression of the documents in Case No. 81-5382 is REVERSED.
 
 
 
 [1]
 The trial court instructed the jury that Bert Slocum could not be found guilty of both Counts II and Counts III
 
 
 [2]
 This section of the opinion summarizes 9 C.F.R. Secs. 92.2(a), 92.11(e) and 92.11(f)(3)(ii)(A, D) (1978)
 
 
 [3]
 Entry into these facilities is carefully monitored to prevent the introduction or spread of disease. All persons are required to shower when entering or leaving the facility and must wear standard issue uniforms when within the facility
 
 
 [4]
 As noted in Section II. A., supra, birds are transferred to a holding facility after they have passed the thirty day quarantine procedure; once in the holding facility, the birds may be sold to the general public
 
 
 [5]
 Birds can "carry" VVND up to 400 days
 
 
 [6]
 On cross-examination, Dr. Gaskin admitted that the birds had likely been moved around a great deal in the holding facility. He also noted that he had no knowledge whether the cockatoos had in fact been tested for VVND; his conclusion was based on the belief that they would have experienced a high mortality rate had they contracted the disease
 
 
 [7]
 See also United States v. Malatesta, 590 F.2d 1379, 1382 (5th Cir.), cert. denied 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979) ("the verdict of a jury must be sustained if there is substantial evidence taking the view most favorable to the government to support it"), citing Hamling v. United States, 418 U.S. 87, 120, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974)
 
 
 [8]
 See also United States v. Marx, 635 F.2d 436, 439 (5th Cir., Unit B, 1981); Thevis, 665 F.2d at 648
 
 
 [9]
 Given the extensive discussion of the evidence in Sections II., A., B., and C., supra, we find it unnecessary to outline the evidence as it relates to each individual defendant. Suffice it to say that we find the least substantial case of participation in the conspiracy to remove birds from quarantine to have been made out against Francille Miller; yet her response to Anthony that she "went through the front door" when asked how the birds got from quarantine to the holding facility manifests both her knowledge of and participation in the conspiracy. This statement and the central role played by Miller in the operations at Quality were sufficient evidence to link her to the overall scheme
 
 
 [10]
 See also United States v. O'Brien, 255 F.Supp. 755, 759 (E.D.Mich.1965), aff'd 365 F.2d 601 (6th Cir.1966), vacated and remanded on other grounds, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967)
 
 
 [11]
 The court addressed Juror No. 4 in typical fashion, asking, "[Do] you feel you can follow the Court's instructions and disregard [the question and answer] completely and have no bearing, whatsoever, as far as weighing the testimony as against these defendants?"
 
 
 [12]
 Bert Slocum also contends that Fed.R.Evid. 404 was violated by a government witness' answer on redirect examination that Slocum was found "guilty" in a prior civil suit Slocum had brought against the government. However, the court immediately sustained a defense objection on grounds of irrelevancy, so we fail to comprehend how an evidentiary rule governing the admissibility of evidence might have been violated. In any case, even if Slocum had contested the answer on appeal on the ground that his right to a fair trial was prejudiced, we would reject the claim because (1) no motion for mistrial was made, and (2) the error was harmless given that the previous case was clearly a civil lawsuit, the subject of which had been broached by Slocum's defense attorney on cross-examination
 Likewise, the defendants' challenge to comments in the prosecutor's closing argument regarding the whereabouts of Sylvia Sakaleros, the USDA official assigned to guard Quarantine # 1 the day of the extermination, is largely frivolous. The government, in response to the defense attorney's statement to the jury that the government had an "obligation" to call Sakaleros, merely reminded the jury that there was no evidence in the case regarding her whereabouts, etc. Again, the defendants made no objection at trial; the government's legitimate response clearly survives the application of the plain error rule. See United States v. Brown, 555 F.2d 407, 420 (5th Cir.1977), cert. denied 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).
 
 
 [13]
 In Brady, the government prosecutor, despite Brady's pre-trial request to examine a co-defendant's extra-judicial statements, withheld a statement in which the co-defendant admitted performing the actual killing for which the defendants were indicted. The Court wrote, "Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment ..." 373 U.S. at 87, 83 S.Ct. at 1196
 
 
 [14]
 This Motion to Continue Sentencing also requested the trial court to reopen and reconsider a previously-denied Motion for New Trial that had been filed pursuant to Fed.R.Crim.P. 33. For the sake of argument, we conclude, without deciding, that this request effectively revived the Rule 33 motion; it is the disposal of this revived motion which we pass on today
 
 
 [15]
 In the alternative, the statements of Crider and Tharp largely constitute an attack on the credibility of government witnesses Anthony and Crumb and therefore do not provide grounds for a new trial. Also, the more substantive allegations of Crider that he was present at Quarantine # 1 during all periods of his assigned work hours are merely cumulative of his testimony at trial that he was in position at all times to view persons either entering or exiting Quarantine # 1
 
 
 [16]
 See United States v. Bokine, 523 F.2d 767, 769 (5th Cir.1975) where the defendant in a drug trafficking case filed a motion to suppress the narcotics after they had been introduced into evidence and the government's direct case completed. This Court affirmed the trial court's denial of the motion on the grounds that the evidence had already been introduced and that the government would have to reopen its case if the evidence was suppressed
 
 
 [17]
 This portion of the search warrant authorized the agents to seize:
 A. Letters, invoices, memoranda, purchase orders, sales records, airwaybills, government forms, receipts of payment, and other documents relating to:
 
 
 [1]
 Red-billed weavers (Quelea quelea ) imported on May 2, 1977
 
 
 [2]
 All birds listed on letter of credit # 79HMS2487 dated October 12, 1979
 
 
 [3]
 Major Mitchell cockatoos mentioned in paragraph 13 and 16
 
 
 [4]
 Galah or Rose-breasted cockatoos listed in paragraph 13 and 16
 
 
 [5]
 True greater cockatoos listed in paragraph 14 and 16
 
 
 [6]
 Peregrine falcons listed in letter dated March 24, 1979 from Quality Bird Company to David Campbell, Lima, Peru
 
 
 [7]
 A packing list dated November 1, 1979 for the Boo Boxe shipment pertaining to paragraph 13
 
 
 [8]
 Peruvian burrowing owls listed in paragraphs 18, 19 and 20
 
 
 [9]
 Birds removed from quarantine station # 1 during January of 1979
 
 
 [10]
 Letter of Credit # 79HMS2497 dated October 12, 1979
 
 
 [11]
 Letter dated March 24, 1979 from Quality Bird Company to David Campbell, Lima, Peru
 
 
 [18]
 Another portion of the warrant, Paragraph C of Exhibit A, authorized seizure of "All other letters, invoices, memoranda, purchase orders, sales records, airwaybills, government forms, receipts of payment and other documents relating to the importing, exporting and transporting of birds in violation of [the federal statutes the defendants were suspected of having violated]." Though we harbor serious doubts as to the sufficiency of the particularity of this portion of the warrant, we need not consider its legality since we conclude that the documents in question were validly seized under Paragraph A of the warrant and the plain view exception to the rule against warrantless searches
 
 
 [19]
 The record is unclear as to whether Smith transferred the folder to Rheinehart or whether he placed the folder back on the bookshelf where Rheinehart picked it up
 
 
 [20]
 Several other challenges by the defense to the search in general and to particular documents seized under the warrant were rejected by the trial court
 
 
 [21]
 In so holding, we do not conclude that such leeway is necessarily reasonable in the circumstances of every case. We merely hold that, given the facts before us, the agents acted reasonably in examining the disputed documents
 
 
 [22]
 The court cited National City Trading Corp. v. United States, 635 F.2d 1020, 1021 (2d Cir.1980) and Matter of Designer Sportswear, 521 F.Supp. 434, 436-7 (S.D.N.Y.1981). See also, United States v. Wuagneux, 683 F.2d 1343, 1348-51 (11th Cir.1982); United States v. Morisse, 660 F.2d 132, 135-6 (5th Cir., Unit A, 1981); United States v. Timpani, 665 F.2d 1, 4-5 (1st Cir.1981)
 
 
 [23]
 This specificity is underlined by the fact that less than five percent of the documents at the Quality offices were seized
 
 
 [24]
 In an office with an orderly filing system, the label on certain files might exempt them from any intrusion by searching agents
 
 
 [25]
 See also Andresen v. Maryland, 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976) ("In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized"); United States v. Tamura, 694 F.2d 591, 595 (9th Cir.1982) ("All items in a set of files may be inspected during a search provided that sufficiently specific guidelines for identifying the documents are provided in the search warrant and are followed by the officers conducting the search.")
 
 
 [26]
 This standard, of course, applies only to a search for documents pursuant to a warrant or a valid exception to the warrant requirement. Naturally, police officers searching for drugs pursuant to a warrant would not be entitled to scrutinize documents since it would be immediately apparent that the documents fell outside the warrant
 
 
 [27]
 See discussion, Section VII. B., supra
 
 
 [28]
 This Court has stated that this third prong is satisfied "if it is immediately apparent to the police officer that he has evidence before him." United States v. Duckett, 583 F.2d 1309, 1313 (5th Cir.1978)